# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Brewer*, 2013 IL App (1st) 072821

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TYRONE BREWER, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-07-2821 |
| Filed | March 29, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for first degree murder and discharging a firearm in a shooting death were upheld over his contentions, *inter alia*, that potential jurors were not asked whether they accepted the *Zehr* principles, that the medical examiner who performed the autopsy did not testify, that his sentence was excessive, and that the mittimus should be corrected to reflect only one murder, since the violation of Rule 431(b) was not plain error, the State's failure to present the examiner who performed the autopsy was not reversible error, and his sentence was not an abuse of discretion, but a correction of the mittimus was ordered. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-13128; the Hon. James B. Linn, Judge, presiding. |
| Judgment | Affirmed; mittimus corrected. |

Counsel on Appeal

Rachel Moran, of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Jon Walters, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE HYMAN delivered the judgment of the court, with opinion.

Justices Lavin and Sterba concurred in the judgment and opinion.


## OPINION

¶ 1    A jury found Tyrone Brewer, the defendant, guilty of first degree murder and personally discharging a firearm in the shooting death of Jeremy McEwen. Brewer was sentenced to 50 years' imprisonment on the first degree murder conviction and a consecutive 30 years for personally discharging a firearm that caused McEwen's death. Brewer appealed his conviction and sentence raising the following six issues for review: (1) the trial court violated Illinois Supreme Court Rule 431(b) (eff. May 1, 2007) by failing to ask potential jurors during *voir dire* whether they understood and accepted the principles set forth in *People v. Zehr*, 103 Ill. 2d 472 (1984); (2) the trial court erred in failing to give a limiting instruction after the State rehabilitated codefendant Finley by presenting his videotaped prior consistent statement as substantive evidence; (3) his sixth amendment right to confront and cross-examine witnesses was violated because the medical examiner who performed the autopsy did not testify; (4) his right to present a defense was violated because the trial court barred his expert witness from testifying about his police related post-traumatic stress disorder (PTSD), which was relevant in assessing the credibility of his statement; (5) his 80-year sentence was excessive; and (6) the mittimus should be corrected to reflect only one murder conviction.

¶ 2    The appellate court addressed only one issue, reversing Brewer's conviction and remanding for a new trial after finding the trial court violated Illinois Supreme Court Rule 431(b) (eff. May 1, 2007), by failing to ask potential jurors during *voir dire* whether they understood and accepted the principles set forth in *People v. Zehr*, 103 Ill. 2d 472 (1984). *People v. Brewer*, No. 1-07-2821 (2010) (unpublished order under Supreme Court Rule 23). Our supreme court denied the State's petition for leave to appeal but entered a supervisory order directing the appellate court to vacate and reconsider its judgment in light of *People v. Thompson*, 238 Ill. 2d 598 (2010) (trial court's violation of amended Rule 431(b) was not structural error requiring automatic reversal nor grounds for reversal under second prong of plain error analysis absent a showing error affected fairness of trial or integrity of judicial

---

*Justice Salone originally sat on the panel of this appeal and participated in its disposition. Justice Salone has retired; therefore, Justice Hyman serves in his stead.

process). *People v. Brewer*, No. 110429 (Ill. Jan. 26, 2011) (supervisory order). We now address the Rule 431(b) issue in light of *Thompson* as well as the other five issues raised by the appeal. For the following reasons, we affirm.

¶ 3                                  I. Factual Background

¶ 4      Jeremy McEwen was fatally shot on June 26, 2001, at about 10:15 p.m., while sitting in his car near 8800 South Clyde Avenue in Chicago. Kimberly Smith, a friend of McEwen's, was in the car with him when the shooting occurred. She and McEwen had agreed to meet at a gas station on 87th Street before heading downtown for dinner. Smith arrived first. McEwen then pulled up to her car and told her to follow him. When they got to Clyde Avenue, Smith parked in front of McEwen. She got out of her car and saw two men approaching. She quickly got into McEwen's car. McEwen was holding money in his left hand. Smith put her hand over McEwen's hand and pushed it down, because she did not want the two men to see the money. While McEwen and Smith were still parked, the two men approached the car. One man was wearing a black hoodie and had his hair in braids; the other man wore a red shirt and had low-cut hair. The man in the red shirt was standing three cars away and looking around. The man in the black hoodie approached the driver's side window, pointed a gun at McEwen and said, "this is a stickup, give me your money." McEwen did not say anything but looked at the gunman and turned down the volume on the car radio. The man in the black hoodie shot the gun once in the air. The man in the red shirt was now standing next to Smith's door, preventing her from getting out. The shooter again demanded money. McEwen started to drive away, and the shooter shot into the car. McEwen continued driving, hit a car, drove onto a lawn, and came to a stop when he crashed into a fence. After he was shot, Smith heard McEwen say "T-Man." Smith later identified the man in the red shirt in a lineup as the lookout.

¶ 5      Police officers investigating the shooting learned Brewer went by the nickname "T-Man." The morning after the shooting, they picked up Brewer at his girlfriend's house and took him to the police station, where he was placed in an interrogation room and advised of his *Miranda* rights. During initial questioning, Brewer implicated himself and two friends, Rashaune Finley and Terrell Ivy, in the murder but said Finley was the shooter. When the police questioned Brewer again, later that day, he identified himself as the shooter and gave a handwritten statement to former Assistant State's Attorney Patrick Brosnan.

¶ 6      According to Brewer's statement, which was published to the jury, on the morning of the shooting he decided he was going to rob someone. At around 9:30 p.m., Brewer, Finley, and Ivy were parked at a gas station when they saw McEwen drive up in a white Oldsmobile Cutlass with expensive-looking tire rims. The men agreed Brewer would rob McEwen and Finley would be the lookout. Ivy would drive the getaway car if Brewer and Finley did not steal McEwen's car. The men followed McEwen in their car as he drove a few blocks before stopping to pick up a female friend. While McEwen and his friend were sitting in the car, Brewer and Finley approached on foot. Finley walked past McEwen's car and looked around to make sure no one was watching. Brewer, who had a gun underneath his hooded sweatshirt, walked up to the open driver's side window. He pointed the gun at McEwen, demanded

money, and told McEwen to get out of the car. When McEwen did not respond, Brewer became angry and fired the gun in the air. He pointed the gun at McEwen again. As McEwen put the car into drive and began to pull away, Brewer fired at McEwen, hitting him in the chest. Brewer saw McEwen drive off and crash into a yard around the corner. Brewer put the gun under his hoodie, and he and Finley walked away. When Brewer heard someone calling "T-Man," he and Finley began to run. A few people chased them but they split up and both got away. While Brewer was running, he threw the gun into a yard.

¶ 7      Codefendant Rashaune Finley, who testified after entering a plea agreement with the State, corroborated Brewer's version of events. Finley said he knew Terrell Ivy and Brewer from school, and Brewer went by the nickname "T-Man." On the afternoon of June 26, 2001, Brewer told Finley he sold marijuana to a man who paid with counterfeit money and he was going to find the man and get his money. Brewer offered Finley and Ivy $500 each to act as lookouts and to beat the man up if he did not pay. Later that evening, Brewer, Finley, and Ivy were parked at a gas station when they saw McEwen drive up in a white Oldsmobile Cutlass with expensive tire rims. Brewer told Finley that McEwen was the man who gave him counterfeit money. The men followed McEwen as he drove out of the gas station and then stopped a few blocks away at 89th Street and Clyde Avenue to pick up a female friend. Finley saw Brewer had a .45-caliber or 9-millimeter gun in his lap, which he put in the front pocket of his hooded sweatshirt. Brewer and Finley approached the car from the back. Finley acted as a lookout. Brewer went to the driver's side window, said something to McEwen, and then fired a shot in the air. When McEwen began to drive off, Brewer fired into the car at McEwen. As Finley and Brewer ran away, Brewer took off his hoodie, wrapped the gun in it, and threw it in a yard. Finley was arrested on June 27, 2011, and gave a videotaped statement to the police that was consistent with his trial testimony.

¶ 8      The shooting occurred near Jesse Owens Park, and several witnesses who were in the park testified at trial. Joseph Fields said he heard a "pop" that sounded like a firecracker then saw McEwen's car drive off before he heard a crashing sound. As Fields walked toward 88th Street, he saw two men, one wearing a red shirt and the other wearing a hoodie. Antwan Sneed testified he also heard a loud pop, then saw McEwen's car speeding down Clyde Avenue before it lost control near 88th Street. Sneed ran toward the car and "noticed two dudes in hoodies walking into the dark." Sneed said Brewer, whom he knew as "T-Man," was wearing a black hoodie. Sneed called out "T-Man" several times, but Brewer picked up his pace and ran away. Sneed later identified Brewer and Finley in a lineup as the two men he saw leaving the scene of the shooting.

¶ 9      Roy Ferguson, who was sitting in his car near the park on the night of the shooting, testified for Brewer. Ferguson said he had known Brewer for almost 10 years and also knew Rashaune Finley. Ferguson identified Finley as the shooter and said he did not see Brewer that night. Ferguson said Finley walked up to a white car, put a hood on, shot two or three times into the car, and ran off.

¶ 10      The autopsy was performed by Dr. Thamrong Chira, who was no longer employed with the Cook County medical examiner's office at the time of trial. Dr. Joseph Cogan, an assistant medical examiner with the Cook County medical examiner's office, testified concerning Dr. Chira's autopsy report. The autopsy revealed McEwen died from a single

gunshot that entered the left side of his chest and exited on the right side of his abdomen. The bullet pierced McEwen's pericardial sac and right ventricle and lacerated his diaphragm, bowel, and liver. McEwen's death was classified as a homicide.

¶ 11    On cross-examination, Dr. Cogan said the autopsy report and photographs showed no evidence of close-range shooting, such as gunshot residue. He said, however, evidence could be blocked by a victim's clothing and would not be present if the shooter was more than 18 inches from the victim. When asked if the evidence could be affected by whether the shooter held the gun in his right or left hand, Dr. Cogan stated, "I don't really get into that. I'm sure Dr. Chira doesn't either. The person could be shot with either the right hand or left hand. It doesn't make too much difference. It depends on the police investigation. Is the direction of the gunshot wound consistent with evidence or history and things like that. It's not something I could determine."

¶ 12    After closing arguments, the jury found Brewer guilty of first degree murder and personally discharging a firearm that proximately caused McEwen's death. Brewer filed a motion for a new trial, which was denied. The court sentenced Brewer to 50 years' imprisonment for first degree murder and an additional consecutive 30 years' imprisonment for personally discharging a firearm. A motion to reconsider the sentence was denied.

¶ 13                                    II. Analysis

¶ 14                                    A. Rule 431(b)

¶ 15    Brewer first contends reversal is required because the trial court failed to comply with Illinois Supreme Court Rule 431(b) by failing to ask potential jurors during *voir dire* whether they understood and accepted the principles set forth in *People v. Zehr*, 103 Ill. 2d 472 (1984). Brewer does not contend the error resulted in a biased jury, but rather, maintains the closeness of the evidence requires a finding of plain error under the first prong of the plain error analysis. He asserts *Thompson* only applies to plain error under the second prong and thus review of the *Zehr* violation is not forfeited for purposes of appeal. We disagree.

¶ 16    In *Thompson*, the supreme court construed the 2007 version of Rule 431(b) and held, "[a] violation of Rule 431(b) does not implicate a fundamental right or constitutional protection, but only involves a violation of th[e] court's rules." *Thompson*, 238 Ill. 2d at 614-15. Despite its amendment to the rule, the court found it could not conclude Rule 431(b) questioning was indispensable to the selection of an impartial jury. *Id*. at 615. The court also rejected defendant's request for plain error review under the second prong, finding defendant failed to establish the trial court's violation of Rule 431(b) resulted in a biased jury. *Id*. In addition, the court held that defendant had not met his burden of showing the error affected the fairness of the trial or challenged the integrity of the judicial process, as the prospective jurors received some of the required Rule 431(b) questioning and the venire was admonished and instructed on Rule 431(b) principles. *Id*. at 611.

¶ 17    Brewer argues the evidence is closely balanced. He notes during deliberations, the jury sent out two notes containing five questions. Additionally, he contends there was no physical evidence tying him to the crime and his conviction turned on several conflicting accounts. First, defense witness Roy Ferguson, who knew both Brewer and codefendant Rashaune

Finley, testified defendant was not present. Further, Brewer notes Kimberly Smith, who was in the car with the victim at the time of the shooting, identified Finley as the shooter in a lineup where both defendant and codefendant were present. Additionally, Brewer argues codefendant Finley's identification of him as the shooter is suspect because his testimony was given in exchange for a lower sentence in his own case. Finally, Brewer argues his inculpatory statement is unreliable because he gave it while in an unmedicated and post-traumatic state. Brewer asserts all these factors establish the closeness of the evidence.

¶ 18    Where a defendant fails to object to an error at trial and include the error in a posttrial motion he or she forfeits ordinary appellate review of that error. *People v. Johnson*, 238 Ill. 2d 478, 484 (2010) (citing *People v. Enoch*, 122 Ill. 2d 176, 186 (1988)). Consequently, Brewer forfeited, or procedurally defaulted, his challenge to the *Zehr* violation by failing to object and raise his claim in a posttrial motion.

¶ 19    Under Illinois's plain error doctrine, a reviewing court may consider a forfeited claim when:

"  '(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *Johnson*, 238 Ill. 2d at 484 (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007), citing *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)).

¶ 20    The doctrine is intended to ensure a defendant receives a fair trial, but it does not guarantee every defendant a perfect trial. *Johnson*, 238 Ill. 2d at 484. Rather than operating as a general savings clause, it is construed as a narrow and limited exception to the typical forfeiture rule applicable to unpreserved claims. *Id*.

¶ 21    We typically undertake plain error analysis by first determining whether error occurred at all before proceeding to consider whether either prong of the doctrine has been satisfied. *People v. Sargent*, 239 Ill. 2d 166, 189-90 (2010). The burden of persuasion rests with the defendant under both prongs of plain error analysis. *Id*. at 190. But, the ultimate question of whether a forfeited claim is reviewable as plain error is a question of law that is reviewed *de novo*. *Johnson*, 238 Ill. 2d at 485.

¶ 22    Under the first prong of plain error, the defendant must show the evidence was "so closely balanced the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error." *Piatkowski*, 225 Ill. 2d at 565. The question of whether the evidence is closely balanced is distinct from the challenge of the sufficiency of the evidence. *Id*. at 566.

¶ 23    We reject Brewer's characterization of the evidence as closely balanced for the purpose of plain error analysis; to the contrary, in our view, the strength of the evidence is overwhelming. First, there were several witnesses to the shooting, including Kimberly Smith, who was in the car with McEwen when he was shot. Smith provided a physical description of the perpetrators and testified she heard McEwen say "T-Man" after he was shot. Smith later identified the man in the red shirt in a lineup as the lookout. Joseph Fields and Antwan

Sneed were in a park near the shooting. Both men heard a loud "pop" that night, and then saw the victim's car speeding down the street before it crashed. Fields saw two men nearby, one in a red shirt and one wearing a black hoodie. Sneed also saw two men in hoodies walking away from the scene. Sneed identified Brewer, whom he knew as "T-Man," as one of the men and said that when he called after him, Brewer ran away. Former Assistant State's Attorney Brosnan testified he took Brewer's inculpatory handwritten statement on June 28, 2001, which was published to the jury. Detective Patrick Golden testified when Brewer was arrested, he implicated himself and codefendants in the murder. Detective Russell Sutherland interviewed Brewer, who said that Finley and Ivy planned the robbery, but he later stated that he fired into the victim's car. Codefendant Finley testified and gave a videotaped statement corroborating Brewer's version of events that night. Dr. James Cogan, the assistant medical examiner, reviewed the autopsy results of the victim, which reflected cause of death as a gunshot wound to the chest.

¶ 24 Based on the strength of the State's evidence, Brewer has failed to satisfy the first prong of plain error. Accordingly, we conclude there is no basis for excusing the forfeiture of Brewer's issues related to the violation of Illinois Supreme Court Rule 431(b) (eff. May 1, 2007) and the decision in *Thompson* requires Brewer's conviction be affirmed on that basis.

¶ 25                  B. Limiting Instruction on Videotaped Prior Consistent Statement

¶ 26 Brewer next contends the trial court failed to give a limiting instruction after the State rehabilitated codefendant Finley by presenting his videotaped prior consistent statement as substantive evidence. Brewer admits Finley's videotaped statement was admissible to rehabilitate him after the defense alleged he had a motive to testify falsely, but argues the trial judge erred in failing to instruct the jury the video statement could only be considered with respect to Finley's believability, not as independent proof of defendant's guilt. Brewer notes though defense counsel did not request a limiting instruction, he did object to the admission of Finley's videotaped statement and raised the issue in his motion for new trial, preserving the issue for review. Alternatively, Brewer contends his trial counsel was ineffective for failing to request a limiting instruction.

¶ 27 The State asserts Brewer forfeited review of this issue or, alternatively, if it is not forfeited, the trial court properly allowed the publication of the videotaped statement. The State further argues any error was harmless. The State notes before publication of the videotaped statement, the defense objected on the ground it would be cumulative, while the State argued it was being offered to rebut a charge of recent fabrication. Moreover, the State notes the trial court offered to give the jury a limiting instruction but the defense objected, and thus, the State contends Brewer's entire argument is in bad faith.

¶ 28 A witness's prior consistent statement is admissible only to rebut a charge or inference he or she was motivated to lie or his or her testimony was of recent fabrication, as long as the prior consistent statement was made before either the motive arose or the alleged fabrication was made. *People v. Smith*, 362 Ill. App. 3d 1062, 1081 (2005).

¶ 29 Defense counsel objected to the videotape of Finley's statement being played for the jury on the grounds that it improperly referred to gang membership and because it would be

cumulative of trial testimony and would bolster that testimony. The trial court indicated it could only be admitted if it were impeaching, and the State noted it could be admitted to rebut a recent fabrication that was alleged by defense counsel on cross-examination. Defense counsel offered to stipulate that Finley told the same version of events six years ago, to which both the State and the trial court replied "not the same." The trial court then indicated the State could play the video but must stop it before the gang reference. The court would also give a limiting instruction as to the redacted portions of the statement, but defense counsel refused the instruction. Further, during the instructions conference, defense counsel never sought any limiting instruction regarding Finley's videotaped statement.

¶ 30    We find this issue is forfeited for purposes of review as defense counsel never objected to the videotaped statement on the basis it was being used as substantive evidence by the State. *Enoch*, 122 Ill. 2d at 185-86. It is not reviewable under plain error as the evidence was not closely balanced nor did the error affect substantive rights or prejudice defendant. We also find defense counsel was not ineffective for failing to request a limiting instruction as any error was harmless in light of the overwhelming amount of evidence against Brewer. Finley testified at trial consistently with the material contained on the tape, and it is unlikely the jury's verdict would have been different but for the admission of the videotaped statement into evidence. See *Strickland v. Washington*, 466 U.S. 668, 694 (1984) (defendant must show counsel's performance fell below objective standard of reasonableness and a reasonable probability that, but for counsel's unprofessional errors, result of proceeding would have been different).

¶ 31                              C. Confrontation Clause Rights

¶ 32    Brewer next contends his confrontation clause rights were violated when the trial court permitted a medical examiner who did not perform the autopsy on Jeremy McEwen to testify at trial regarding the autopsy report. Brewer did not object to this testimony at trial or include the issue in his posttrial motion. Therefore, we must determine whether this issue is reviewable as plain error. Ill. S. Ct. R. 615 ("[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded" unless the appellant demonstrates plain error). As noted above, the first step of plain error analysis is deciding whether any error has occurred. *People v. Walker*, 232 Ill. 2d 113, 124-25 (2009). If there was no error in the first instance, there can be no plain error. *People v. Bannister*, 232 Ill. 2d 52, 79 (2008).

¶ 33    Brewer contends *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004), supports his argument that his sixth amendment rights were violated when the State was permitted to introduce into evidence autopsy results on McEwen through the testimony of a medical examiner who did not perform the autopsy. In *Crawford*, the United States Supreme Court held that when a declarant does not appear for cross-examination at a defendant's trial, the sixth amendment of the United States Constitution requires the declarant's testimonial evidence not be admitted unless the witness is unavailable and the defendant had an opportunity to cross-examine the witness. *Id*. at 68. The Court left "for another day any effort to spell out a comprehensive definition of 'testimonial.' " *Id*.

¶ 34      In subsequent opinions, the Court found certain types of forensic evidence to be testimonial and inadmissible under the standard set forth in *Crawford*. For instance, in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), involving charges of distributing and trafficking of cocaine, the Court held affidavits of analysts at a state laboratory averring that a substance was cocaine were testimonial statements and "[a]bsent a showing that the analysts were unavailable to testify at trial *and* that petitioner had a prior opportunity to cross-examine them, petitioner was entitled to be confronted with the analysts at trial." (Emphasis in original.) (Internal quotation marks omitted.) *Id.* at 311 (quoting *Crawford*, 541 U.S. at 50). Similarly, in *Bullcoming v. New Mexico*, 564 U.S. ___, 131 S. Ct. 2705 (2011), the Court found a certified blood-alcohol-concentration report prepared "solely for an 'evidentiary purpose' " and made in "aid of a police investigation" was testimonial. *Id.* at ___, 131 S. Ct. at 2717. Therefore, its admission into evidence required either live testimony from the analyst who performed the test and certified the report, or a finding that the analyst who performed the test was unavailable and the defendant had a prior opportunity to cross-examine that analyst. *Id.* at ___, 131 S. Ct. at 2713. The "surrogate" testimony of another analyst who did not personally perform or observe the performance of the test was insufficient to satisfy the requirements of the confrontation clause. *Id.* at ___, 131 S. Ct. at 2710.

¶ 35      The Court's divided decision in *Williams v. Illinois*, 567 U.S. ___, 132 S. Ct. 2221 (2012), was its most recent effort to define "testimonial." In *Williams*, defendant was convicted following a bench trial of, among other offenses, aggravated criminal sexual assault. *Williams*, 567 U.S. at ___, 132 S. Ct. at 2227. An expert for the State, who was an Illinois State Police forensic biologist, testified that a DNA profile produced by Cellmark Diagnostics Laboratory matched a profile generated by the State Police lab using defendant's blood sample. Specifically, the State asked DNA expert Sandra Lambatos whether there was " 'a computer match generated of the male DNA profile found in semen from the vaginal swabs of [L.J.] to a male DNA profile that had been identified as having originated from Sandy Williams.' " (Emphasis omitted.) *Id.* at ___, 132 S. Ct. at 2236. The Cellmark report itself was not admitted into evidence. *Id*. at ___, ___, 132 S. Ct. at 2230, 2235. In addition, the expert did not vouch for the accuracy of the profile generated by Cellmark. *Id*. at ___, 132 S. Ct. at 2227. The defendant's main contention was that the confrontation clause was violated when the expert "referred to the DNA profile provided by Cellmark as having been produced from semen found on the victim's vaginal swabs." *Id*. at ___, 132 S. Ct. at 2227.

¶ 36      The plurality of the Court, including Chief Justice Roberts, and Justices Alito, Kennedy, and Breyer, concluded not all forensic reports offered by the State are testimonial statements, and reports violate the confrontation clause when they are made for the purpose of proving the guilt of a particular targeted defendant at trial. *Id.* at ___, 132 S. Ct. at 2243. The forensic reports in *Melendez-Diaz* and *Bullcoming* "ran afoul of the Confrontation Clause because they were the equivalent of affidavits made for the purpose of proving the guilt of a particular criminal defendant at trial." *Id.* at ___, 132 S. Ct. at 2243. Conversely, the DNA report in *Williams* "plainly was not prepared for the primary purpose of accusing a targeted individual," since the defendant "was neither in custody nor under suspicion" when the vaginal swabs for sent to the outside lab for testing. *Id.* at ___, 132 S. Ct. at 2243. In

*Williams*, the report was not admitted into evidence, but the plurality found even if it had been, there would have been no confrontation clause violation because "the primary purpose of the Cellmark report, viewed objectively, was not to accuse petitioner or to create evidence for use at trial." *Id.* at ___, 132 S. Ct. at 2243.

¶ 37    Justice Thomas disagreed with the plurality's rationale in *Williams* but concurred in the judgment because the statements at issue lacked the " 'formality and solemnity' " to be testimonial for purpose of the confrontation clause. *Id.* at ___, 132 S. Ct. at 2255 (Thomas J., concurring).

¶ 38    In a dissenting opinion, Justice Kagan, joined by Justices Scalia, Ginsburg, and Sotomayor, found precedent dictated that the test for determining whether a forensic report is testimonial is whether the primary purpose of an out-of-court statement was to provide evidence of past events that are potentially relevant to subsequent criminal prosecution, regardless of whether a particular suspect is targeted. *Id.* at ___, 132 S. Ct. at 2273 (Kagan, J., dissenting, joined by Scalia, Ginsburg and Sotomayor, JJ.).

¶ 39    Shortly after the divided opinion in *Williams* was issued, the Illinois Supreme Court decided *People v. Leach*, 2012 IL 111534. In *Leach*, defendant was charged with first degree murder in the strangling death of his wife. The autopsy report on the victim was admitted into evidence through the expert testimony of a medical examiner who had not performed the autopsy but had reviewed the autopsy report in forming her opinion on the cause of death. Since no limitations were placed on the autopsy report's admission into evidence, the supreme court found it was admitted for the truth of the matter asserted. *Leach*, 2012 IL 111534, ¶ 67. The court concluded the report was admissible, however, under exceptions to the hearsay rule set forth in the Illinois Rules of Evidence and state statute. *Id.* ¶ 66.

¶ 40    The court then considered whether admission of the results of the autopsy report violated the confrontation clause. After summarizing United States Supreme Court decisions on the confrontation clause though the holding in *Williams*, the court found that regardless of which definition of primary purpose is applied, the autopsy report was not testimonial because it was: (1) not prepared for the primary purpose of accusing a targeted individual or (2) for the primary purpose of providing evidence in a criminal case. *Id.* ¶ 54. The court stated, "the primary purpose of preparing an autopsy report is not to accuse 'a targeted individual of engaging in criminal conduct' (*Williams*, 567 U.S. at ___, 132 S. Ct. at 2242) or to provide evidence in a criminal trial (*Davis* [*v. Washington*,] 547 U.S. [813,] 822 [(2006)]). An autopsy report is prepared in the normal course of operation of the medical examiner's office, to determine the cause and manner of death, which, if determined to be homicide, could result in charges being brought." *Id*. ¶ 130. "Unlike a DNA test which might identify a defendant as the perpetrator of a particular crime, the autopsy finding of homicide did not directly accuse defendant. Only when the autopsy findings are viewed in light of defendant's own statement to the police is he linked to the crime. In short, the autopsy sought to determine how the victim died, not who was responsible ***." *Id*. ¶ 132.

¶ 41    The court acknowledged there is "confusion regarding application of primary purpose test to reports of forensic testing[, which] may eventually be resolved by the United States Supreme Court." *Id*. ¶ 136. "In the meantime," the court stated: "[W]hile we are not prepared

-10-

to say that the report of an autopsy conducted by the medical examiner's office can never be testimonial in nature, we conclude that under the objective test set out by the plurality in *Williams*, under the test adopted in *Davis*, and under Justice Thomas's 'formality and solemnity' rule, autopsy reports prepared by a medical examiner's office in the normal course of its duties are nontestimonial. Further, an autopsy report prepared in the normal course of business of a medial examiner's office is not rendered testimonial merely because the assistant medical examiner performing the autopsy is aware that police suspect homicide and that a specific individual might be responsible." *Id.* ¶ 136.

¶ 42 The court found even if the trial court erred in admitting the autopsy report, any error was harmless because if the autopsy report and medical examiner's testimony were omitted from evidence, the outcome of the trial would not have been different. *Id*. ¶ 150. In a dissenting opinion, Chief Justice Kilbride disagreed with the majority's reliance on *Williams*, "a fractured opinion with no majority support for its rationale." *Id*. ¶ 161 (Kilbride, C.J., dissenting). He further stated the court should have been guided by *Crawford v. Washington*, 541 U.S. 36 (2004), because *Williams* is factually distinguishable. *Leach*, 2012 IL 111534, ¶ 164. He also disagreed with the majority's harmless error analysis, because it was dicta and purely advisory. *Id*. ¶ 170.

¶ 43 Applying the holding in *Leach*, we find the autopsy report was not testimonial and its admission into evidence did not implicate Brewer's confrontation clause rights. The purpose of the autopsy was to determine how McEwen died, not who was responsible. Nothing in the autopsy report linked Brewer to the shooting and it is only when the autopsy findings are viewed in light of Brewer's own statement to the police and other evidence at trial is there a connection established between Brewer and the crime. Further, the trial court did not err in permitting someone other than the medical examiner who performed the autopsy to testify because as the supreme court stated in *Leach*, "if the [autopsy] report was properly admitted, the expert witness's testimony cannot have violated the confrontation clause even if it had the effect of offering the report for the truth of the matters asserted therein." *Id.* ¶ 57. Therefore, we find the trial court did not err in permitting the State to present Dr. Cogan to testify about the results of Dr. Chira's autopsy report on McEwen. Since there was no error in the first instance, there can be no plain error. *Bannister*, 232 Ill. 2d at 79.

¶ 44 Further, even if this court finds the trial court erred in permitting Dr. Cogan to testify, this was not the type of structural error that would require automatic reversal regardless of forfeiture or lack or prejudice. *People v. Glasper*, 234 Ill. 2d 173, 197-98 (2009) ("automatic reversal is only required where an error is deemed 'structural,' *i.e.*, a systemic error which serves to 'erode the integrity of the judicial process and undermine the fairness of the defendant's trial' "). The United States Supreme Court has found infringement of four basic rights of defendants constitute structural error requiring automatic reversal: the right to counsel; the right to self-representation; the right to a public trial; and the right to a trial by jury when an erroneous instruction on reasonable doubt affects that right. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 149 (2006). Illinois courts have expanded the list to include infringement of the right to a jury trial by the denial of a defendant's request for special verdict forms where the answers to those forms could affect the defendant's sentence. *People v. Smith*, 233 Ill. 2d 1, 27-28 (2009).

¶ 45    The alleged error in this case does not fall into those categories. It was not a structural error and there was no prejudice to Brewer, who failed to explain what advantage he would have gained by cross-examining the physician who performed the autopsy. In *Melendez-Diaz* and *Bullcoming*, cases relied on by Brewer, the forensic evidence at issue, an affidavit attesting a substance found in defendant's possession was cocaine and defendant's blood-alcohol concentration report respectively, were directly related to proving defendants' guilt in the crimes charged. Here, the autopsy report prepared by Dr. Chira merely states the cause of death, an issue never in doubt. On cross-examination, defense counsel asked Dr. Cogan whether McEwen was shot at close-range and whether the autopsy findings would have been different if the shooter were left or right handed. Dr. Cogan stated there was no evidence McEwen was shot at close range and neither he nor Dr. Chira could have an opinion as to whether the shooter was left- or right-handed. In short, cross-examining Dr. Chira would have not elicited evidence that could have changed the outcome of the trial, and therefore, the State's failure to present him as a witness was not be reversible error.

¶ 46                  D. Expert Testimony on Post-Traumatic Stress Disorder

¶ 47    Next, Brewer contends he was denied his right to present a defense where the trial court barred Dr. Joyce Miller from testifying about his police-related PTSD. Brewer asserts his defense was that the inculpatory statement he gave to the police was incredible because he suffered from police-related PTSD when he gave the statement, and the trial court prevented him from introducing expert witness testimony about his PTSD diagnosis and treatment.

¶ 48    "The admission of the opinion of an expert, like the admission of any evidence, is a matter within the discretion of the trial court." *People v. Driver*, 62 Ill. App. 3d 847, 853 (1978). "Where the trial court's rulings restrict the right to present a defense or to cross-examine witnesses, our duty on review is to determine whether the trial court's rulings constituted an abuse of its discretion." *People v. Jackson*, 303 Ill. App. 3d 583, 587 (1999).

¶ 49    Dr. Miller originally testified during the hearing on Brewer's motion to suppress. She said she treated Brewer between May and June of 2001, when he was referred to her for a psychiatric evaluation to determine if a homebound program was still needed from his school. She initially met with Brewer on May 14, 2001, and learned he had been beaten by police about 1 ½ months earlier and had been placed in a homebound program for school. Miller diagnosed Brewer with PTSD resulting from the incident and prescribed Zoloft to manage his symptoms. She testified Brewer could have a stressful reaction to seeing a police car or hearing sirens. On cross-examination, Miller said she last saw Brewer on June 4, 2001, and had no opinion regarding the events surrounding his arrest on June 27, 2001, including whether he was still taking his medication or whether his statement was freely given.

¶ 50    Before trial, the State filed a motion *in limine* to preclude Miller's testimony because it was irrelevant as she had no opinion as to the voluntariness of Brewer's statement. Since neither party could produce transcripts of Miller's testimony during suppression hearing, the trial court denied the State's motion. After trial began, the State renewed its motion once transcripts were secured. The trial court barred Miller's testimony, finding it could confuse the jury and would not shed any light on any issue in the case, because Miller was unable to

render any opinion or make a projection as to whether Brewer was susceptible to police pressure to give a statement on the issue of voluntariness.

¶ 51   The trial court has the power and discretion to exclude evidence offered by the defense in a criminal case on the basis of irrelevancy without infringing on an accused's constitutional right to present a defense. *People v. Dalzotto*, 55 Ill. App. 3d 995, 998 (1977). See also *Chambers v. Mississippi*, 410 U.S. 284 (1973); *Washington v. Texas*, 388 U.S. 14 (1967). "Testimony is relevant if it would, if believed, tend to make any fact in issue more or less probable than it would be without the testimony." *People v. Makiel*, 263 Ill. App. 3d 54, 70 (1994).

¶ 52   We find the trial court did not abuse its discretion in barring Dr. Miller from testifying at trial. Contrary to Brewer's assertions, she did not have an opinion as to whether Brewer's PTSD affected the voluntariness of his statement to police. She had last seen Brewer several weeks prior to the shooting and was unaware if he was taking the prescribed medication at the time of his arrest. Thus, her testimony was irrelevant to the voluntariness of Brewer's statement at the time of his arrest and its exclusion did not infringe on his right to present a defense.

¶ 53                              E. Defendant's Prison Sentence

¶ 54   Brewer next argues his aggregate 80-year sentence is excessive where the trial judge placed emphasis on a factor inherent in the offense and failed to adequately consider he was 18 years old at the time of the offense, had a minimal criminal background, and had significant potential for rehabilitation.

¶ 55   In imposing a sentence on a defendant, the trial judge may not consider facts implicit in the underlying offense for which defendant was convicted. *People v. James*, 255 Ill. App. 3d 516, 531 (1993). A judge may consider the nature and circumstances of the offense, however, including the nature and extent of each element of the offense as committed by the defendant. *Id*. at 532. "A reviewing court may not alter a defendant's sentence absent an abuse of discretion by the trial court." *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). A sentence will be deemed an abuse of discretion where it is " 'greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense.' " *Id*. (quoting *People v. Stacey*, 193 Ill. 2d 203, 210 (2000), citing *People v. Fern*, 189 Ill. 2d 48, 54 (1999)). "[W]here mitigation evidence is before a court, it is presumed the court considered that evidence, absent evidence to the contrary." *People v. Lampley*, 405 Ill. App. 3d 1, 13 (2010) (citing *People v. Canet*, 218 Ill. App. 3d 855, 864 (1991)). The sentencing range for first degree murder is between 20 and 60 years. 730 ILCS 5/5-8-1(a)(1)(a) (West 2008).

¶ 56   During the sentencing hearing, the trial court noted applicable factors in mitigation and aggravation. During aggravation, the trial court made the following statements:

"Factors in aggravation, the defendant's conduct did cause or threaten serious harm, the ultimate serious harm, murder. The defendant received compensation for committing the offense, no, but this was a robbery that turned into a murder, felony murder. The defendant has a history of prior delinquency or criminal activity. Although minimal, yes, he does have a history of prior delinquency, not a stranger to the criminal justice system.

-13-

Four is not applicable. Five is not applicable. Six is not applicable. Seven is absolutely applicable. The sentence is necessary to deter others from committing the same crime. Eight and nine are not applicable. And I believe the other factors in aggravation that I've looked through, 10, 11, 12, 13, 14, 15, on through 20 and 21 are not applicable."

¶ 57 The record does not indicate the trial court emphasized a factor inherent in the offense during sentencing. Contrary to Brewer's assertions, the fact his conduct threatened or caused serious harm is not a factor inherent in the crime itself but is a proper aggravating factor to be considered during sentencing even in cases where serious bodily harm is implicit in the offense. See *People v. Salvidar*, 113 Ill. 2d 256, 269 (1986); *People v. Solano*, 221 Ill. App. 3d 272, 274 (1991); *People v. Spencer*, 229 Ill. App. 3d 1098, 1102 (1992). Moreover, Brewer's sentence was well within the statutory sentencing range for first degree murder, and the existence of mitigating factors does not mandate imposition of the minimum sentence nor preclude imposition of the maximum sentence. *People v. Flores*, 404 Ill. App. 3d 155, 158 (2010). We conclude the trial court did not abuse its discretion in sentencing Brewer to a 50-year prison term for first degree murder.

¶ 58 Brewer also received a consecutive 30-year prison term for personally discharging a firearm that caused the death of another. Section 5-8-1(a)(1)(d)(iii) of the Unified Code of Corrections states: "if, during the commission of the offense, the person personally discharged a firearm that proximately caused great bodily harm, permanent disability, permanent disfigurement, or death to another person, 25 years or up to a term of natural life shall be added to the term of imprisonment imposed by the court." 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2006). Brewer's additional 30-year prison term was well within the statutory sentencing range. The sentence was not an abuse of discretion.

¶ 59 F. Mittimus

¶ 60 Lastly, Brewer contends the mittimus should be amended to reflect one conviction for first degree murder rather than two and to further state Brewer was sentenced to a consecutive 30-year prison term for personally discharging a firearm that proximately caused the death of the victim. See 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2008). The State concedes the mittimus should be corrected.

¶ 61 This court has the authority to directly order the clerk of the circuit court to make the necessary corrections to Brewer's sentencing order. *People v. McCray*, 273 Ill. App. 3d 396, 403 (1995). Therefore, we direct the clerk of the circuit court to correct the mittimus.

¶ 62 III. CONCLUSION

¶ 63 For the foregoing reasons, we affirm the defendant's conviction and sentence, and order the mittimus to be corrected.

¶ 64 Affirmed; mittimus corrected.