2025 IL App (1st) 231147-U

No. 1-23-1147

Order filed July 14, 2025.

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 02 CR 10455 |
| | ) | |
| MARGARET DEFRANCISCO, | ) | The Honorable |
| | ) | Lawrence Flood, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court.
Justices Pucinski and Cobbs concurred in the judgment.

**ORDER**

¶ 1   *Held*:  We affirm defendant's 30-year sentence for first degree murder over her contention that the court abused its discretion by "erroneously" focusing on the seriousness of the offense rather than the "extensive" mitigation evidence.

¶ 2   On December 14, 2004, following a jury trial, defendant Margaret DeFrancisco was sentenced to a total of 46 years in prison for first degree murder. Defendant was 16 years old at the time of the offense. On January 9, 2020, the circuit court granted defendant relief pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)), vacated her

sentence, and set the case for resentencing pursuant to *Miller v. Alabama*, 567 U.S. 460 (2012), and *People v. Buffer*, 2019 IL 122327. Following a new sentencing hearing, the court imposed a 30-year sentence for first degree murder. On appeal, defendant contends that the court abused its discretion when it imposed a 30-year sentence for an offense committed when she was a juvenile by erroneously focusing on the seriousness of the offense and failing to adequately consider "extensive" mitigation evidence. We affirm.

¶ 3     We briefly summarize the evidence at trial.

¶ 4     The evidence at trial established that on June 6, 2000, defendant fatally shot Oscar Velaquez in the back of the head in the basement of defendant's family home.

¶ 5     A female friend testified that defendant asked her to bring her boyfriend's firearm to defendant's home. The friend went to defendant's home and "handed it over." When the friend asked why defendant wanted the firearm, defendant stated that she wanted to scare the victim for money. The friend understood this to mean that defendant planned to rob the victim. The friend was present as defendant and her older sister Regina DeFrancisco (Regina) discussed where to rob the victim, went to the basement for 7 to 10 minutes, and then returned.

¶ 6     The friend further testified that when the victim arrived, Regina went to the basement and called him downstairs. Defendant followed with the firearm behind her back. After hearing a gunshot, the friend began going downstairs, but was met by defendant on the stairs, who handed her the firearm. After the friend put the firearm in her purse, she went to the basement where she saw the victim on the floor, bleeding from the ear with his right hand shaking. The sisters went through the victim's pockets, and defendant removed a firearm from the victim's waistband. When the friend asked "why did they do that," they did not answer. The friend went back upstairs, but

later helped the sisters, who had wrapped the victim's body in sheets, carry the body to the victim's vehicle, where they placed it in the trunk. The girls drove to another location where the body was set on fire.

¶ 7    Defendant, who admitted that she shot the victim, testified that the victim was angry with Regina over a debt. The victim and Regina were in the basement when defendant heard the victim call Regina a "b***" and Regina scream " 'Please don't shoot me.' " When defendant began to go downstairs, a female friend handed her a firearm. Once downstairs, defendant saw the victim waving a firearm. She believed that the victim would shoot Regina and the firearm she held "went off." She did not remember pulling the trigger; she just wanted the victim to "stop."

¶ 8    The jury found defendant guilty of first degree murder. She was sentenced to 46 years in prison, consisting of 21 years for first degree murder and a 25-year firearm enhancement. We affirmed on direct appeal. See *People v. DeFrancisco*, No. 1-05-0068 (2006) (unpublished order under Supreme Court Rule 23). Defendant then filed an unsuccessful postconviction petition.

¶ 9    On December 19, 2017, defendant filed a *pro se* motion for leave to file a successive postconviction petition. The petition alleged that defendant's 46-year sentence was a *de facto* life sentence imposed on a juvenile in violation of *Miller* and its progeny and sought a new sentencing hearing. The circuit court granted leave to file the petition and appointed counsel. On January 9, 2020, the court granted defendant postconviction relief and ordered a new sentencing hearing.

¶ 10    The court then ordered a presentence investigation (PSI) report

¶ 11    The PSI indicated that defendant was raised by her physically abusive mother and her father was "never around." However, when defendant spent time at her grandmother's house, her childhood was " 'perfect.' " Defendant was physically and sexually abused by her mother's

boyfriend. When defendant's aunt reported the abuse to the Department of Children and Family Services (DCFS), defendant's mother did not cooperate with DCFS. Defendant was raised in a high crime neighborhood, where she witnessed crime and drugs.

¶ 12    Defendant completed the ninth grade prior to her arrest and obtained a GED in 2002, while on bond. She received good grades and was never expelled or suspended from school. Defendant obtained an associate's degree in prison, and was, at the time of the PSI report, working on a bachelor's degree. She also obtained certificates in dog grooming and training. During her incarceration she worked at Leisure Time Services. Defendant had no prior criminal background.

¶ 13    Defendant related that the offense was " 'spur of the moment' " and not planned. She had just turned 16 years old and was " 'pretty immature.' " She only thought about getting in trouble with her mother and not about the legal consequences. She additionally asserted that, at trial, she " 'had no idea what was going on.' " She was " 'very regretful and remorseful' " and wished that the offense had not happened.

¶ 14    Defendant had strong emotional support from her family. She had a " 'great' relationship" with her 18-year-old daughter and they spoke as much as possible. Defendant had two close friends, who visited her in prison and spoke with her often. She enjoyed exercise, crochet, and the "Restorative Justice Team."  Prior to the Covid-19 pandemic, she attended church in jail.

¶ 15    Defendant was in good physical health and volunteered monthly with the mental health counseling group at her correctional institution. She was previously diagnosed with post-traumatic stress disorder (PTSD), and was recently prescribed antianxiety medication due to the anxiety caused by the resentencing.

¶ 16    In mitigation, the defense presented a mitigation report, a psychiatric evaluation, defendant's transcripts from Lakeland College and Northwestern University, and four letters in support.

¶ 17    The mitigation report noted that although defendant believed, based upon her original sentence, that she would not be released until she was 65 years old, she made "extraordinary efforts" to rehabilitate herself. Defendant's mother was the victim of domestic violence, her father was a drug addict, and defendant's mother left defendant's father after he hit her with a vacuum cleaner. Defendant's mother obtained an order of protection, but within months, defendant's father set the apartment on fire. Defendant last saw her father during first grade and she later learned that he was high on LSD at that time.

¶ 18    Defendant's mother, who worked two jobs, was not affectionate, did not like to "joke around," and would tell defendant not to touch her and to leave her alone. Additionally, defendant's mother used "excessive" corporal punishment and never apologized. Defendant's mother's boyfriend sexually abused defendant and Regina, and threatened to break defendant's legs if she revealed the abuse. Due to the abuse, defendant failed second grade and nine-year-old Regina attempted suicide. Defendant's mother eventually married the boyfriend despite the abuse and his arrest for a child sex offense involving defendant's cousin. Defendant was close to her maternal grandparents and enjoyed their home, which was clean and had enough food.

¶ 19    Defendant's family concealed her after the offense. She was then arrested and released on bond. While on bond, she obtained a GED and an assistant nurse certificate, and became pregnant. Defendant's daughter, Aurora Sanchez, was born in 2003, and defendant's desire to be a good

mother became her "single and greatest purpose in life." Although defendant's mother had legal guardianship of Sanchez, Sanchez visited defendant often and they spoke on the phone daily.

¶ 20 During her incarceration, defendant worked as a baker and a seamstress and received favorable performance evaluations. Defendant pursued an education, as well as certificates for working as a pet care technician and HIV/AIDS peer educator, and became a secondary handler working to train service dogs. Defendant received 13 disciplinary tickets between 2005 and 2019, but was also described as a " 'model inmate.' "

¶ 21 The mitigation report noted that the original sentencing court had no knowledge of defendant's abuse, neglect, and traumas, and that there was a "strong relationship" between the level of traumatic stress suffered in childhood and the risks of poor physical, mental, and behavioral health as one aged. In other words, a stressful or traumatic childhood can result in social, emotional, and cognitive impairment. The report concluded that at the time of the offense, defendant's prefrontal cortex, which was responsible for processing decisions, consequences, impulses, and independent thought, was not fully formed.

¶ 22 Attached to the mitigation report were, in pertinent part, numerous additional letters in support, defendant's certificates, a psychiatric evaluation report, and an affidavit in which the affiant averred that the third girl at the offense wished to recant her trial testimony and had only told police what they wanted to hear.

¶ 23 Dr. Lisa Rone performed the psychiatric evaluation. In her report, Dr. Rone noted that during childhood, defendant was subjected to her mother's physical abuse, verbal outbursts, and "violent" rejection, and was raised in a chaotic home with food insecurity, drug use, and physical violence. Additionally, defendant's mother chose not to "alienate" her boyfriend despite her

knowing that he sexually abused defendant and Regina, and defendant's mother made the girls visit him in jail. Dr. Rone opined that at the time of the offense, defendant was experiencing symptoms from untreated PTSD and acted to protect Regina. Defendant's severe and repeated childhood trauma made her "particularity susceptible" to acting impulsively. Defendant showed no signs of sociopathic behavior; rather, she was empathetic and expressed remorse. Dr. Rone concluded that defendant would be employable if released and would benefit from therapy for residual PTSD symptoms and to support community reintegration.

¶ 24    On April 6, 2023, the court held a sentencing hearing. Initially, the judge stated that he reviewed the transcripts from defendant's trial and sentencing in 2004, as he did not preside over trial. The court also reviewed defendant's direct appeal, the mitigation report and exhibits, the psychiatric evaluation, the letters of support, and the tickets defendant received in prison.

¶ 25    The State published the victim impact statement of the victim's mother, who stated that the victim, her eldest child, was hardworking and a protector, and that his death scarred the family and led to two of his siblings' lupus diagnoses.

¶ 26    The defense presented Jennifer Lackey, a philosophy professor at Northwestern University and the founding director of the Northwestern Prison Education Program, which helps prisoners obtain bachelor's degrees. Lackey testified that, nationally, there is 75% recidivism within five years for those released from prison, but "just over" 5% recidivism for those released from prison with a bachelor's degree. Defendant was in the initial class of 20 prisoners admitted to the program and would graduate in two years with a bachelor's degree from a "top ten university." The application process was "extremely competitive" and only included prisoners who "clear[ed]" prison policies, including having no disciplinary tickets within a certain time period. Lackey

described defendant as one of the "absolute top applicants." If defendant were released prior to the completion of her degree, the program would support her to ensure completion. Lackey, who knew defendant "quite well," described her as engaged, outgoing, and "community-orientated."

¶ 27 Sanchez, defendant's then 19-year-old daughter, read a letter into the record. Sanchez had visited defendant since Sanchez was a baby and did not understand that defendant was in prison until Sanchez was almost 12 years old. Sanchez had "endless" letters and phone calls from defendant, who gave "a thousand percent while *** so far away." After Sanchez told defendant that other children received daily notes in their lunch boxes, defendant sent envelopes of notes so that Sanchez also had one each day. Once Sanchez got her own phone, she spoke to defendant at least three times a week. She described defendant as her parent and friend. Sanchez thought it was "crazy" that defendant received such a long sentence for an offense committed at age 16, when Sanchez still felt "like a baby" at age 19. She wanted her mom home to fill an "empty hole." Sanchez asserted that defendant grew up and rehabilitated herself.

¶ 28 In allocution, defendant stated that she apologized although she knew that her actions were unforgivable, and asked to be seen as "something other than the worst thing" she had done. She rehabilitated herself to make up for her actions, but acknowledged a debt that she could never repay. She participated in the Restorative Justice Team and stated that "[g]iving back" will be her life's work.

¶ 29 In aggravation, the State argued that defendant shot the victim in the back of the head, then wrapped and burned the body. The State also noted that defendant lied to police about her involvement in the victim's death, fled, and was not arrested for two years. The State concluded that although defendant admitted to shooting the victim, she continued to "minimize" her actions

rather than admitting that she "executed an unarmed man." The State acknowledged that defendant bettered herself in prison, but argued that did not "erase" what she did.

¶ 30    In mitigation, the defense argued that the juvenile brain was immature and had no understanding of consequences. Counsel argued that defendant accepted responsibility and lived with guilt and shame. However, defendant grew, changed, and rehabilitated. In more than 20 years in prison, defendant was an "amazing" mother, hardworking student, and "truly unique from others in the prison community." Counsel alleged that an offense committed by a child could not be evaluated without understanding the life that child was "forced to endure." Here, defendant was repeatedly sexually abused by her mother's boyfriend in their home, and only felt protected with her grandparents.

¶ 31    Counsel noted that when defendant disclosed the abuse, her mother did not believe her and later married defendant's abuser. In her childhood, defendant suffered physical, emotional, and sexual abuse, was neglected, and saw her parents engage in domestic abuse, substance abuse, and divorce. Although defendant had PTSD, she functioned at a "high level" and followed prison rules. While defendant's childhood did not excuse her actions "outright," it explained her mindset preceding the offense.

¶ 32    Turning to the facts of the case, counsel noted that the victim called Regina 24 times during the days preceding the offense, knew he had been "conned," and purchased a firearm. Additionally, defendant had just turned 16 years old and there was "no doubt" that her trauma affected her cognitive function that day. However, the woman before the court was not that 16-year-old; rather, she was a "poster child" for rehabilitation. All that defendant accomplished was because she wanted to be someone of whom her daughter was proud despite believing she would not be

released until age 65. Counsel asked the court to sentence defendant to 21 years in prison, the sentence originally imposed for first degree murder without the firearm enhancement.

¶ 33    In imposing sentence, the court noted that it additionally considered the PSI, the testimony, and defendant's statement in allocution. The court then stated it must also consider the seriousness of the offense, the objective of restoring the offender to useful citizenship, defendant's age, and the other factors in mitigation. The court characterized the mitigation report and psychiatric evaluation as comprehensive, and acknowledged defendant's childhood, the "difficult circumstances," and the efforts she made while incarcerated although her sentence was 46 years to be served at 100%. Defendant pursued an education, participated in "groups," and established relationships with counselors.

¶ 34    The court commended defendant for participating in the Northwestern University program. The court also noted that, unlike the original sentencing court, it had *Miller* and its progeny, which discussed the development of the juvenile brain, the impulsivity and immaturity of juveniles, and the "lack of being able to perform—or to make rational decisions at times," coupled with, in defendant's case, PTSD from a traumatic childhood. The court further noted that defendant was "obviously" rehabilitating herself to be a productive person when released from prison.

¶ 35    The court also noted that this was an "execution-style murder," followed by an attempt to conceal the offense and subsequent "desecration of the body." Although the court did not believe that the minimum sentence was warranted, a "maximum" 40-year sentence was also inappropriate, given the evidence in mitigation. The court then stated:

"And I really have to say that in the cases that I've dealt with for re-sentencing, your case, by far, has shown the greatest effort and the greatest accomplishment towards rehabilitation that I have heard in these cases.

That being said, I can't neglect the seriousness of the case, and the seriousness of the charge, and the seriousness of the act."

¶ 36    The court sentenced defendant to 30 years in prison, which would give defendant the opportunity to spend time with her daughter and lead a "productive life." Defendant filed a motion to reconsider sentence, which the court denied.

¶ 37    On appeal, defendant contends that the court abused its discretion when it imposed a 30-year sentence for an offense committed when she was 16 years old. She argues that the court improperly focused on the seriousness of the offense and failed to adequately consider the "extensive" mitigation evidence.

¶ 38    The Illinois Constitution requires that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. When balancing "the retributive and rehabilitative purposes of punishment," the trial court must carefully consider "all factors in aggravation and mitigation, including, *inter alia*, the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well as the nature and circumstances of the crime and of defendant's conduct in the commission of it." *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002).

¶ 39    When determining a sentence, "the trial court has broad discretionary powers." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). A sentence within statutory limits will be deemed "excessive"

and an abuse of discretion when it is "greatly at variance with the spirit and purpose of the law" or is "manifestly disproportionate to the nature of the offense." *Id.* at 210. Where a sentence falls within the statutorily mandated guidelines, it is presumed to be proper. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46. When reviewing a defendant's sentence, this court will not reweigh the aggravating and mitigating factors and substitute our judgment for that of the trial court merely because we would have weighed these factors differently. *People v. Jones*, 2019 IL App (1st) 170478, ¶ 50.

¶ 40    In *Miller*, the United States Supreme Court held that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without the possibility of parole for juvenile offenders. *Miller*, 567 U.S. at 479. The Supreme Court therefore instructed sentencing courts to "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id*. at 480.

¶ 41    Accordingly, because defendant was 16 years old at the time of the offense, the court was required to consider the factors in mitigation as outlined in section 5-4.5-105 of the Unified Code of Corrections (Code) when imposing sentence. See 730 ILCS 5/5-4.5-105(a) (West 2020) (additional sentencing factors for offenders under 18 years old at the time of the offense). This section also gave the court discretion to "decline to impose any otherwise applicable sentencing enhancement based upon firearm possession *** with personal discharge that proximately causes *** death to another person." See 730 ILCS 5/5-4.5-105(b) (West 2020).

¶ 42    Here, defendant's conviction for first degree murder was subject to a sentence of 20 to 60 years in prison. 720 ILCS 5/9-1(a)(1) (West 2000); 730 ILCS 5/5-8-1(a)(1) (West 2000). Moreover, because she personally discharged the firearm that killed the victim, she was subject to

a discretionary 25-year sentencing enhancement. 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2000); 730 ILCS 5/5-4.5-105(b) (West 2020) (a sentencing court may, in its discretion, decline to impose an otherwise applicable firearm sentencing enhancement on an offender who was under 18 years old at the time of the offense). The court imposed a 30-year sentence, which was within statutory guidelines, and is therefore presumptively proper. *Knox*, 2014 IL App (1st) 120349, ¶ 46.

¶ 43     Nonetheless, defendant contends that the court failed to adequately consider the "extensive" mitigation evidence including that she was experiencing PTSD symptoms at the time of the offense due to childhood trauma, she was accepted into an "elite" Northwestern University program during her incarceration, and she exhibited a "remarkable" transformation since the offense.

¶ 44     Absent some indication to the contrary, other than the sentence itself, a reviewing court presumes the sentencing court considered all mitigating evidence presented. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19. That presumption may be overcome by "affirmative evidence" that the sentencing court failed to consider factors in mitigation. *People v. McWilliams*, 2015 IL App (1st) 130913, ¶ 27. In this case, defendant has not identified such evidence.

¶ 45     To the contrary, the court specifically mentioned the mitigation report and psychiatric evaluation, and acknowledged the "difficult circumstances" of defendant's childhood. The court commended defendant for her admission into the Northwestern University program and for "obviously" rehabilitating herself, despite her original 46-year sentence at 100%. The court also noted the general impulsivity and immaturity of juvenile brains, which, in this case, was coupled with defendant's PTSD. The court concluded that, of all the resentencing cases in which the court was involved, defendant had "shown the greatest effort" and "greatest accomplishment toward

rehabilitation." However, the court was also mindful of the seriousness of the offense, an "execution-style murder" that defendant and her companions tried to conceal and which resulted in the "desecration" of the victim's body. A trial court may properly consider the circumstances of the offense, including "the nature and extent of each element of the offense as committed by the defendant" (*People v. Brewer*, 2013 IL App (1st) 072821, ¶ 55) and "need not give greater weight to any potential for rehabilitation than to the seriousness of the offense" (*People v. Murray*, 2020 IL App (3d) 180759, ¶ 33). Here, the court found that the seriousness of the offense did not warrant a minimum sentence, but that the maximum sentence was likewise inappropriate considering the mitigation evidence. See *People v. Jones*, 2014 IL App (1st) 120927, ¶ 55 ("the presence of mitigating factors neither requires a minimum sentence nor precludes a maximum sentence").

¶ 46    While defendant may believe the mitigation evidence warranted the statutory minimum sentence, the court was not required to agree. See *People v. Wyma*, 2020 IL App (1st) 170786, ¶ 99 (rejecting the argument that "the seriousness of the criminal offense had taken a back seat to rehabilitative potential for the purposes of juvenile sentencing" and noting that the seriousness of the offense "remains the most important factor when a trial court undertakes to balance the retributive and rehabilitative purposes of punishment"). Ultimately "the seriousness of an offense, and not mitigating evidence, is the most important factor in sentencing." *People v. Wilson*, 2016 IL App (1st) 141063, ¶ 11.

¶ 47    This is not a case, as defendant acknowledges, where the court failed to consider the mitigation evidence. Rather, she argues the mitigation evidence was so extensive that the court abused its discretion by failing to impose the statutory minimum sentence. However, in reviewing a defendant's sentence, we will not substitute our judgment for that of the lower court merely

because we may have weighed the factors in aggravation and mitigation differently. See *Jones*, 2019 IL App (1st) 170478, ¶ 50; see also *People v. Fern*, 189 Ill. 2d 48, 53 (1999) ("In considering the propriety of a sentence, the reviewing court must proceed with great caution and must not substitute its judgment for that of the trial court merely because it would have weighed the factors differently.").

¶ 48     Here, the evidence at trial established the defendant asked a friend to bring her a firearm, shot the victim in the basement of her family home, and burned the body in an attempt to hide the offense. Based on the record before us, we cannot say the court's imposition of a 30-year sentence for first degree murder was an abuse of its discretion. See *People v. Crenshaw*, 2011 IL App (4th) 090908, ¶ 24 ("The balance to be struck amongst the aggravating and mitigating factors is a matter of judicial discretion that should not be disturbed absent an abuse of discretion.").

¶ 49     For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 50     Affirmed.