# Illinois Official Reports

## Appellate Court

---

### *People v. Wyma*, 2020 IL App (1st) 170786

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHRISTOPHER WYMA, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>No. 1-17-0786 |
| Filed | September 30, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CR-18264(02); the Hon. Neil J. Linehan, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Jessica D. Ware, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Brian A. Levitsky, and Ahmed Islam, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE GRIFFIN delivered the judgment of the court, with opinion.<br>Justice Pierce concurred in the judgment and opinion.<br>Justice Walker specially concurred, with opinion. |

**OPINION**

¶ 1    After a jury trial, defendant was found guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 2012)) and sentenced to two concurrent terms of natural life imprisonment. Defendant appeals his convictions. Defendant claims that the trial court should have granted his motion to quash arrest and suppress the evidence and that its sentencing determination was an abuse of discretion. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3    On the night of September 11, 2011, victims John and Maria Granat (John and Maria) were beaten with baseball bats while they lay asleep in their beds. John got up and tried to fight back, but his efforts were unsuccessful. He sustained additional blows to face and body and died on the floor. Maria initially survived the beating but was stabbed 21 times in the stomach and succumbed to her injuries. The victims' son, John Granat (Granat), was arrested and charged in connection with the murders. Granat's friends, defendant Christopher Wyma (Wyma) and Ehab Qasem (Qasem), were charged with committing the brutal murders. Qasem turned State's witness, entered a plea of guilty to first degree murder (*id.*), and received a jail sentence of 40 years. Defendant and Granat went to trial. A jury found them guilty of first degree murder. After a hearing, defendant was sentenced to two concurrent terms of natural life imprisonment. This appeal concerns defendant only.

¶ 4    Before trial, defendant moved to quash his arrest and suppress statements he made to police on October 9, 2011. Defendant maintained he was in custody when questioned, and *Miranda* warnings were required but not given. See *Miranda v. Arizona*, 384 U.S. 436 (1966). Defendant also argued that the police employed a "question first, warn later" technique and deliberately withheld *Miranda* warnings until after he confessed to the crimes. The trial court held a hearing on the suppression motion and heard testimony from two witnesses: Detective Sajid Haidari and defendant.

¶ 5                                A. Suppression Hearing
¶ 6                                  1. Detective Haidari

¶ 7    Detective Haidari of the Cook County Sheriff's Department testified that he was assigned to investigate the deaths of John and Maria on September 11, 2011. He and Detective Ambrose Kelly went to defendant's home at 4 p.m. to corroborate information other detectives had obtained from Granat about a potential alibi. Defendant answered the door and agreed to go to the Maywood police station to discuss an investigation involving Granat. Defendant asked if someone could drive him home. Defendant was told that someone would do so. Before defendant entered Detective Haidari's car, he was searched for safety purposes. Detective Haidari's car did not have a cage separating the front and back seats. No possessions were taken from defendant at his home or on the trip to the police station.

¶ 8    Upon arriving at the police station, defendant was taken to a secure room on the second floor. The room was unlocked. Defendant was not handcuffed or given *Miranda* warnings. The interview began at 5 p.m. Detectives Haidari and Kelly questioned defendant about his relationship to Granat. Defendant was allowed to go to the bathroom, and when he returned, defendant sat at a detective's desk and logged onto his Facebook page. Defendant proceeded

to identify his friends' profile pages and pictures. Defendant then signed consent forms, allowing the police to search his cellphone and his Facebook account. Information was downloaded from defendant's cellphone, and it was given back to defendant before he left the police station. Detective Haidari testified that defendant provided information during the interview that was inconsistent with the information provided by Granat. Defendant left the police station at 1 a.m. and was told to come back the next day to speak with a Cook County Assistant State's Attorney (ASA).

¶ 9        On September 12, 2011, police officers transported defendant to the police station. Defendant's father, a police officer with the Palos Hills Police Department, accompanied him to the station. Defendant was interviewed by an ASA for 20 minutes. The conversation was videotaped. Defendant was not handcuffed or given *Miranda* warnings. Defendant left the police station with his father. He returned the next day, September 13, 2011, and gave testimony before the grand jury. Detective Haidari testified that defendant was not threatened with arrest on September 11, 2011, and he was not a suspect on September 11, 12, or 13. Rather, he was considered a potential witness and valuable to the murder investigation.

¶ 10       A month later, on October 9, 2011, Detectives Haidari and Kelly went back to defendant's home at 10:30 a.m. Detective Haidari testified that he had obtained historical cellphone location data that was inconsistent with previous statements made by defendant regarding his whereabouts. Detectives asked defendant to contact Qasem. According to defendant, Qasem was at his house. Qasem was located and agreed to accompany the detectives to the police station. Defendant was interviewed at 11 a.m. He was not given *Miranda* warnings. At 12 p.m., defendant was interviewed again and drew a "diagram." Detective Haidari testified that, after defendant drew the diagram, he became a suspect in the case. The detectives started recording the conversation and read defendant his *Miranda* rights. The interview continued.

¶ 11       On cross-examination, Detective Haidari confirmed that defendant was free to leave on September 11 and 12 because he was a witness at that point. Defendant's mother was allowed to bring him medication on the night of September 11, 2011. Detective Haidari indicated that defendant could have left with his mother. On redirect-examination, Detective Haidari testified that defendant had to be escorted within the police station because it was a secure facility. Again, defendant would have been allowed to leave. Defendant made no request to leave.

¶ 12                                    2. Defendant

¶ 13       Defendant testified that he was 17 on September 11, 2011. Defendant was at his house that day, his father went to Menards, and two detectives arrived at his doorstep. Defendant testified that he refused to give the detectives his cellphone and told them he did not want to go to the police station. Defendant eventually complied because "they told [him] [he] had to." According to defendant, the detective threatened to charge him with obstruction. Defendant went to the police station in Maywood and was questioned and then released. Defendant testified that he was locked in a room and that he asked to go home. He wanted to call his parents, but the police indicated that they would do it for him. Defendant's mother and sister picked him up at 1 a.m. He left with his cellphone. Defendant denied having given police permission to download text messages from his cellphone.

¶ 14       Defendant testified that, on September 12, 2011, two detectives arrived at his house. He told them he did not want to go to the police station. Defendant's father objected at first, but then accompanied defendant to the police station. Defendant gave a videotaped statement. On

September 13, 2011, defendant was picked up by a detective and gave testimony before the grand jury.

¶ 15    Defendant testified that detectives went to his house again on October 9, 2011. They told him he needed to go back to the police station for more questioning. Defendant refused and testified that his mother did not want him to go to the station. According to defendant, the detectives told him he would be arrested if he did not go with them. Defendant testified that each time the police asked him to go somewhere, he refused and did not go voluntarily.

¶ 16    On cross-examination, defendant testified that his father was a police officer with the Palos Hills Police Department. On the morning of September 11, 2011, Qasem was at his house. Detectives arrived at 4 p.m. and asked if he would speak with them about Granat. Defendant testified that went to the police station after being threatened with arrest. He was not handcuffed.

¶ 17    Defendant initially testified that the detectives took his cellphone on the car ride to the police station. Defendant, however, changed his story when confronted with the testimony he gave on direct examination. Defendant explained that he gave the detectives his cellphone at his house, it was returned to him in the car, and then it was taken from him as soon as he got out of the car.

¶ 18    Defendant was interviewed by Detective Haidari on September 11, 2011, at 5 p.m. He was not given *Miranda* warnings. The first interview lasted 25 minutes. Defendant used the bathroom and then showed police officers his Facebook page, identifying the names of individuals he was with on the morning of September 11, 2011. Defendant was placed in the interview room, which he knew was locked because he tried to open the door. At 6:05 p.m., defendant signed a consent form for police to search his cellphone. Defendant testified that he did not read the form before signing it. At 6:31 p.m., defendant was presented with a consent form to search his Facebook account. He read the form, wrote down his account number and password, and signed it.

¶ 19    Defendant testified that his mom and dad did not know he was at the police station. But then he changed his testimony, indicating that his mom came to the police station to give him medicine at 8:15 p.m. Defendant saw his mom face-to-face. Defendant was aware that one of his friends was being questioned at the police station, and he left at 1 a.m. Defendant testified that he was not fingerprinted, handcuffed, or photographed. Defendant's mother, his sister, and Qasem left the police station with him.

¶ 20    Police officers came back to defendant's home on September 12, 2011. Defendant testified that they spoke with his father, who initially refused, but then agreed to accompany him to the police station. Defendant and his father rode in the officer's car uncuffed to the station. Defendant agreed to make a videotaped statement with an ASA. Defendant's father sat outside the room while defendant was interviewed. When asked how the detectives had treated him, defendant answered "great."

¶ 21    Defendant saw his friends at the police station, including Qasem, and they all discussed with police officers a time when they would be picked up to testify before the grand jury. The next day, on September 13, 2011, defendant, Qasem, and another friend were picked up by detectives and brought to the grand jury. Defendant gave testimony that day as a witness and told the grand jury that the police officers' treatment of him was "perfect." Defendant testified at the grand jury that no one made any threats or promises to him in return for his testimony

and that his testimony was given freely and voluntarily. When defendant was done testifying before the grand jury, he went home.

¶ 22 Defendant further testified on cross-examination that detectives came to his home on October 9, 2011, at 10:30 a.m. Defendant's friend, Qasem, was with him, and they both went to the police station. Defendant testified that the detectives threatened him with arrest. Defendant's mother knew he was going to the police station in Maywood. He was not handcuffed. Defendant was interviewed at 11 a.m. and 12 p.m. He was not given *Miranda* warnings. Defendant drew a "map" for the detectives. He was left alone for some time, he fell asleep, and the detectives returned to the interview room at 2:15 p.m. Defendant was read his *Miranda* rights and gave a statement.

¶ 23                                    3. Ruling on the Suppression Motion

¶ 24 The trial court made detailed factual findings on the record and denied the suppression motion. The trial court found that defendant's name initially came up in the investigation after police had a conversation with Granat, who told police he was with defendant at his house on the night his parents were murdered. Police followed up on the alibi. They had a conversation with defendant at his house and then at the police station. The trial court found that it was "pretty clear" during and after encounters with the police that defendant was afforded the opportunity to talk with his parents. Defendant's mother "actually came on the 11th *** she was allowed to give defendant medication, allowed to talk to him." Defendant told the police that he was not with Granat on the night of the murders and "in reality *** broke Granat's own alibi." Defendant was allowed to go home with his mother, his sister, and another witness.

¶ 25 Defendant went to the police station the next day, on September 12, 2011, with his father. Defendant's father was a police officer, who "clearly understands how investigations are conducted *** and allowed his son to be videotaped by the police at the time." Arrangements were made for defendant to appear before the grand jury, and defendant and his father were brought back to their house. The next day, defendant testified before the grand jury. Police returned to defendant's house a month later, he was brought to the police station, and during a conversation with police, he drew a diagram. At that point, defendant had "gone from being a cooperating witness throughout these communications and meeting with the police and is now, in fact, a suspect." Police turned on the video recorder and, before questioning defendant as a suspect, gave him his *Miranda* warnings.

¶ 26 The trial court allowed prosecutors to present at the hearing defendant's videotaped statements made at the police station and his testimony given before the grand jury. The trial court noted that when asked how the police treated him, defendant used the terms "great" and "perfect." Defendant further indicated that no one had threatened or promised him anything. The trial court found the "only inconsistency" between the testimony of the defendant and Detective Haidari was defendant's claim that he only accompanied police to the station and participated in interviews after being threatened with arrest for obstruction of justice. The trial court resolved the inconsistency against defendant. It found—based on "defendant's own words, both on video and in front of the grand jury"—that he had been treated "great" and "perfect" by the police. These words rendered the alleged threats of arrest not credible. In total, the trial court found Detective Haidari's testimony credible, and defendant's testimony not credible. The trial court denied defendant's suppression motion. The case proceeded to trial

before a jury.

¶ 27                                    B. Jury Trial

¶ 28         Officer Christopher Hodorowicz of the Palos Heights Police Department testified that he stopped a Chevy Blazer at 5:18 a.m., on September 11, 2011, because the car's rear license plate light was not working. He identified the driver of the car as Granat, and observed, as Granat opened the glove compartment, a water bottle containing a yellow liquid. Granat explained the liquid was chlorine for his friend's pool. A few hours later, Officer Hodorowicz went to a home after receiving a suspicious activity call. He saw Granat in the back of a police car and the Chevy Blazer in the driveway.

¶ 29         Officer Elizabeth Hogan of the Cook County Sheriff's Department testified that she spoke with Granat on the morning of September 11, 2011, at his home. Granat made two comments Officer Hogan believed were unusual. Granat asked Officer Hogan if the fire department was going to "clean up the mess" because he wanted to continue to live in the house. Defendant also commented that he would have to take over the family business because he did not want 20 employees to lose their jobs. Officer Hogan characterized Granat's demeanor at the scene as calm.

¶ 30         Officer Brian Zych of the Cook County Sheriff's Department testified that he searched the scene of the crimes and found no forced entry. John was lying face up in the bedroom; he was unrecognizable. Maria was badly beaten, and her body was left on the bed. There were no visible signs of life and blood was everywhere.

¶ 31         Detective Stephen Moody of the Cook County Sheriff's Department testified that he interviewed Granat, who gave several different stories about where he was on the night his parents were murdered. Granat initially testified that he was asleep in the basement when the murders occurred, but changed his story, indicating that he was at defendant's house. Detective Moody obtained a court order for the cellphone records of Granat, defendant, and Qasem. He sent out the records for analysis. When they returned, Detective Moody learned that, from 2 a.m. until 3:30 a.m., on September 11, 2011, defendant's, Granat's, and Qasem's cellphones were in the area of Granat's home. Around 4 a.m., the cellphones were in the area of defendant's home.

¶ 32         Detective Moody sought to interview defendant based on this information. Defendant and Qasem were brought to the police station on October 9, 2011. Detective Moody interviewed defendant, who told him that he and Qasem went on a "blunt run" on the night of September 11, 2011, and stopped by Granat's home. Defendant stated that Granat told him he had killed his parents, and asked defendant to go check to see if they were dead. Defendant then asked for a piece of paper and drew a picture of the master bedroom. Detective Moody noticed that the picture was an accurate depiction of the crime scene. Detective Moody left the interview room, turned on the video and audio equipment, returned, and gave defendant his *Miranda* warnings. Detective Moody testified that, at that moment defendant drew the picture, he believed defendant was involved in the murders.

¶ 33         Portions of defendant's videotaped statement were played for the jury. In his videotaped statement, defendant initially indicated that Granat's parents were dead when he and Qasem arrived at Granat's home. Defendant then changed his story and told detectives the following: he had a Skype call with Granat at 2 a.m. on September 11, 2011, during which Granat gave him and Qasem the code word "concert" to let him know that his parents were asleep;

- 6 -

defendant knew Granat wanted him and Qasem to kill his parents, and Granat was pressuring them to do so; defendant and Qasem hit the parents with baseball bats, and Qasem stabbed Maria because she was still making noises; Granat came back to defendant's house where they used Clorox wipes to wipe the blood off the bats and knife; they burned the Clorox wipes and gloves in a bonfire; the person who drove defendant and Qasem to Granat's house on the night of the murders, Mohammad Salahat, tossed the bats in a forest preserve; defendant put the knife in a field across the street from his house; defendant gave his bloody shirt to his girlfriend, Stephanie Wydra; defendant was paid $9000 to kill John and Maria; a month before the murders, defendant gave Granat chlorine from his shed; Granat was initially going to use the chlorine to poison his parents' coffee.

¶ 34    The ASA who interviewed defendant on September 12, 2011, read the grand jury transcript of defendant's testimony into the record at trial. Defendant testified that Granat told defendant that he hated his parents and wanted them dead; around 1:46 a.m. on September 11, 2011, defendant had a conversation with Granat via Skype; the conversation ended at 2 a.m.; defendant and Qasem spent the night at defendant's house and Qasem left to go home around 8 or 9 a.m.; no one had made any threats or promises to him in return for his testimony; and his testimony was given freely and voluntarily.

¶ 35    Cook County Deputy Medical Examiner James Filkins testified about the autopsies of John and Maria. John and Maria sustained multiple injuries that included skull fractures, jaw and nose fractures, lacerations, bruises, and brain hemorrhages. Maria had suffered 21 stab wounds to her torso, hand, and lip. John and Maria's injuries were consistent with being beaten by a bat. Maria's injuries were consistent with being stabbed with a knife. Examiner Filkins testified to a reasonable degree of medical certainty that the manner of death for each victim was homicide.

¶ 36    Qasem testified for the State at trial pursuant to a negotiated plea agreement. He pled guilty to first degree murder in exchange for his truthful testimony against defendant and Granat, and a 40-year prison sentence. Qasem testified that he, Salahat, and defendant were at defendant's home looking for weapons they could use to kill Granat's parents in September 2011. Defendant looked under the porch and saw two metal baseball bats and a machete. Defendant stated, "I guess we'll use these." Salahat agreed to be the driver. Qasem agreed to help defendant kill John and Maria. Qasem and defendant remained in contact with Granat via text message.

¶ 37    Qasem testified that on September 10, 2011, he was at defendant's home. Defendant, Salahat, and some other friends were present. Granat arrived at some point in the afternoon. Granat was frustrated and talking fast, he wanted his parents killed that day. Qasem went downtown with Salahat to buy a vaporizer to smoke marijuana and received a text message from defendant around 7 or 8 p.m., asking Qasem to come to his house. Qasem and Salahat went to defendant's house, where he told them that Granat was going to Skype him and talk about a "concert." The word "concert" was a cover; Granat and others were going to an upcoming concert. Granat's use of the word was a cue for defendant and Qasem to go to his home and kill his parents while they slept. Qasem went to buy gloves at Menards and returned to defendant's home. Defendant, Qasem, and Salahat switched cars and took a van owned by Qasem's dad.

¶ 38    Qasem further testified that, at approximately 1:46 a.m. on September 11, 2011, Granat called defendant via Skype and used the code word "concert." Defendant and Qasem took the

baseball bats, and Salahat drove them to Granat's home. Qasem described the mood in the car as "a bunch of idiots ready to go kill two people and think nothing of it." When they arrived at Granat's home, Granat signaled them from a bush with a light. They were led into the back of the house and took off their shoes. Qasem noticed about nine "stacks of money" in the garage. Qasem and defendant walked up the staircase to where John and Maria were sleeping. On the way up the stairs, their baseballs bats clinked and made a loud noise. Qasem testified that he and defendant freaked out and walked back to the garage. Granat told them to go back upstairs. Qasem testified that he told defendant he could not go through with it. Defendant responded by slapping Qasem on the back and said: "F*** that. You ready to live like a king?"

¶ 39     Defendant opened the door to John and Maria's bedroom. Defendant got on the left side of their bed, Qasem took to the right side. Qasem testified that they each raised their baseball bats over their heads and struck John and Maria. They both aimed for the head. John and Maria cried and yelled, but they continued to strike them with baseball bats. John got up and tried to defend himself. Qasem left Maria and helped defendant hit John. Qasem struck John in the face. He fell to the ground and stopped moving. Maria lay in bed, making a gurgling noise. Defendant placed a pillow over her head and struck her a few more times. Qasem and defendant ran downstairs. Granat was counting money in the garage. Defendant told Granat that his mother was still breathing. Granat replied, "[G]o take care of it." Granat handed Qasem a knife. He went upstairs and found Maria still gurgling. He stabbed her in the stomach multiple times.

¶ 40     Qasem testified that he looked for a safe in the attic at Granat's direction. He could not find it. Defendant took a box full of jewelry and bag full of coins. Salahat picked them up, and they drove to defendant's home. Granat arrived 20 minutes later and distributed the money he was counting in the garage. He gave Salahat $4000 and handed $8000 to Qasem and defendant. He gave another $5000 to defendant for killing his mother. Defendant put the baseball bats under his porch. Qasem, defendant, and Salahat discussed the story they would tell police if ever questioned about the murders: he, defendant, and Salahat went to dinner on the night of September 11, 2011. They then returned to defendant's home, delivered marijuana to someone at 55th and Harlem, and played video games at defendant's house for the rest of the night. Qasem told this story to police on September 11 and 12, and to the grand jury on September 13, 2011. Qasem admitted that he lied to the grand jury and to police.

¶ 41     Qasem further testified that on October 9, 2011, he was at defendant's house when detectives arrived at the front door. He and defendant went to the police station voluntarily. Qasem testified that he heard defendant's mom give permission for her son to go with detectives. Qasem changed his story during the interview with detectives. At first, he told them the plan was to rob John and Maria, not kill them, and that Granat had already killed his parents when he and defendant arrived at the home. Qasem was placed under arrest.

¶ 42     Defendant's girlfriend, Stephanie Wydra, testified that defendant was not acting like himself on September 12, 2011. She asked him what was wrong, and he explained that he was in a bad situation with Granat. Wydra found $15,000 in a guitar bag in defendant's bedroom. Defendant told her that he got the money for helping Granat. Wydra further testified that defendant gave her a shirt with blood on it. Sometime during the week after John and Maria's deaths, defendant told Wydra that he could not get their screams out of his head.

¶ 43     Police recovered the knife used to murder John and Maria across the street from defendant's house. They found the two baseball bats in a forest preserve at 102nd Street and 90th Street. Defendant's bloody shirt was recovered from Wydra. Police recovered two

laptops: one from defendant's bedroom, another from Granat's home. The parties stipulated that a forensic examination revealed that a Skype call between users "Mclovin 6960" and "Chris C Wizzie Wyma" took place between 1:46 a.m. and 1:57 a.m. on September 11, 2011. In defendant's backyard, police found a bonfire pit. A test of the blood on defendant's shirt revealed a match with the DNA profile of John.

¶ 44 Defendant moved for a directed verdict. The motion was denied. The jury found defendant guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 2012)). The trial court held a sentencing hearing.

¶ 45                                                C. Sentencing

¶ 46 The State read the victim impact statements from John's brother and Maria's sister, and asked the trial court to fashion the appropriate sentence. Defense counsel argued in mitigation that defendant had no convictions on his record, he was close to completing his general education degree, and he was well-behaved in jail. A sentencing memorandum filed by defense counsel included (1) an article entitled "Adolescent Development and Competency," (2) a mitigation report prepared by mitigation specialist, Barbara Scott, and (3) 11 letters from friends and family. The article outlined how excessive video game playing and the prolonged use of marijuana are linked to aggression and violent behavior. Defense counsel indicated that defendant played violent video games.

¶ 47 Defendant's mother, sister, and brother testified on his behalf at the sentencing hearing. They explained that defendant's father abused alcohol, would have angry outbursts, and was a "womanizer." Defendant gave a statement in allocution. He told the trial court that the offense was "horrible" and it "should have never happened." He asked the victims' families for forgiveness.

¶ 48 The trial court made extensive findings of fact on the record. It explained that defendant was 17 at the time he committed the crimes, and therefore the trial court had to consider the attendant circumstances of his youth as required by Illinois statute. The trial court specifically referenced *Miller v. Alabama*, 567 U.S. 460 (2012), which held that mandatory life-without-parole sentences for juveniles are unconstitutional and explained there were

> "differences between juveniles under 18 and adults. First, juveniles have a lack of maturity and underdeveloped sense of responsibility. Second, juveniles are more vulnerable and susceptible to negative influences and outside pressures including peer pressure. Third, the character of a juvenile is not as well formed as that of an adult."

The trial court made clear that it read the mitigation packet prepared by defense counsel, which contained

> "a synopsis as far as state legislature's approach as to juvenile sentencing, discussions as to both physical and psychological development of young people at different periods of their life, between a young adult in their 20s and a 17-year-old both physically and psychologically, and we're well aware of those findings."

Special care was given to the mitigation and the information related to defendant's youth and its attendant circumstances.

¶ 49 The trial court discussed the seriousness of the criminal offenses committed by defendant and made clear that it believed they were particularly "brutal and heinous." The trial court explained that defendant "was not only involved in the actual taking of those lives by beating

those people with those bats, but he was clearly involved in the planning, commission, and subsequent attempts to hide that this offense took place." The trial court described the events as a "criminal conspiracy" from "beginning to end" and noted that defendant undertook significant efforts to plan, execute, cover up, and conceal the murders. The trial court referenced the evidence presented at trial, explaining that "[t]here's no question that the evidence in this case against this defendant was overwhelming" and "that the defendant was proven beyond a reasonable doubt of the horrible, horrible murders that took place on September 11, 2011."

¶ 50   The trial court indicated that there was no separating defendant from Granat:

> "[Defendant] was clearly involved in the recruiting of the other co-defendants, the planning and the commission of the offense, the gathering of the weapons including the machete, ultimately going over to that house where his hand with that bat struck those people until they were dead, left that room in a bloodbath with Mr. Granat's head literally caved in, parts of his jaw strewn around the room, and Mrs. Granat, who was in her death rattle as clearly described by this defendant, and they went back downstairs and asked the Defendant Granat what to do and went back up there and she was stabbed 20 more times as she was dying."

The trial court stated that the apparent motivation for the murders was "greed."

¶ 51   The trial court went to great lengths in considering defendant's youth and specifically considered section 5-4.5-105 of the Unified Code of Corrections (730 ILCS 5/5-4.5-105 (West 2016)), which lists several factors a trial court must consider when sentencing a juvenile, such as defendant. The trial court was unpersuaded by defense counsel's argument that defendant was pressured by Granat to commit the murders and noted that, based on the evidence, defendant himself applied the pressure. When Qasem was unsure whether he could go through with the murders, defendant slapped him on the back and told him, "F*** that. You ready to live like a king?" When Granat showed a glimmer of regret for his role in the murders, defendant again said "F*** that" and "They deserved it." The trial court found that no evidence was presented to substantiate the claims that defendant was physically abused by his father. The trial court duly considered the studies linking video games and marijuana to violence.

¶ 52   In total, and in consideration of all the evidence presented at the sentencing hearing, the trial court determined that the factors offered in aggravation and mitigation, and the seriousness of the offense, demonstrated that defendant was irredeemable and irreparably corrupt. The trial court stated, "I don't take what happened in this case lightly, but I will say that the horrible, horrible way in which the Granats died is as bad as anything that I've seen or dealt with in 34 years in criminal law." Defendant was sentenced to serve two natural life terms of imprisonment. Defendant's motion to reconsider sentences was denied.

¶ 53   Defendant appeals his convictions and claims that his suppression motion should have been granted and that no reasonable person would have handed down the sentence that the trial court did in this case. The State contends that the trial court was correct to deny the suppression motion, and the evidence presented at the murder trial, independent of defendant's statements to police on October 9, 2011, could have supported his guilty beyond a reasonable doubt. The State further argues that the trial court's sentencing determination was not an abuse of discretion.

¶ 54                                    II. ANALYSIS
¶ 55                  A. Whether Defendant Was in Custody for *Miranda* Purposes
¶ 56        In *Miranda*, 384 U.S. at 444, the United States Supreme Court prescribed a set of prophylactic warnings that a police officer must provide to a suspect before he or she conducts a "custodial interrogation." "Custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* The finding of custody is essential because the preinterrogation warnings required by *Miranda* are intended to assure that any inculpatory statement made by a defendant is not simply the product of " 'the compulsion inherent in custodial surroundings.' " *Yarborough v. Alvarado*, 541 U.S. 652, 661 (2004) (quoting *Miranda*, 384 U.S. at 458).

¶ 57        The determination of whether a defendant is "in custody" for *Miranda* purposes involves " '[t]wo discrete inquiries *** : first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.' " *People v. Braggs*, 209 Ill. 2d 492, 505-06 (2003) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). When examining the circumstances of interrogation, this court has found a number of factors to be relevant in determining whether a statement was made in a custodial setting, including (1) the location, time, length, mood, and mode of the questioning; (2) the number of police officers present during the interrogation; (3) the presence or absence of family and friends of the individual; (4) any indicia of a formal arrest procedure, such as the show of weapons or force, physical restraint, booking, or fingerprinting; (5) the manner by which the individual arrived at the place of questioning; and (6) the age, intelligence, and mental makeup of the accused. *People v. Slater*, 228 Ill. 2d 137, 150 (2008). No single factor is dispositive, and the court should consider all of the circumstances in the case. *People v. Hannah*, 2013 IL App (1st) 111660, ¶ 43.

¶ 58        After examining and weighing these factors, we must make an objective determination as to whether, under the facts in the record, " 'a reasonable person, innocent of any crime,' " would have believed that he or she could terminate the encounter and was free to leave. *Slater*, 228 Ill. 2d at 150 (quoting *Braggs*, 209 Ill. 2d at 506). Under the facts of this case, however, we must modify the reasonable person standard and consider what a reasonable juvenile would have thought under the same circumstances. *Braggs*, 209 Ill. 2d at 510. It is undisputed that defendant was a 17-year-old in September and October 2011, when he traveled to the police station, gave testimony before the grand jury, and participated in police interviews.

¶ 59        In reviewing a trial court's ruling on a motion to suppress evidence, we apply the two-part standard of review adopted by the Supreme Court in *Ornelas v. United States*, 517 U.S. 690, 699 (1996). *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). Under that standard, we give deference to the factual findings of the trial court, and we will reject those findings only if they are against the manifest weight of the evidence. *People v. Lindsey*, 2020 IL 124289, ¶ 14. This is a deferential standard of review, and one grounded in the reality that the circuit court is in a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony. *People v. Pitman*, 211 Ill. 2d 502, 512 (2004). Factual findings are against the manifest weight of the evidence when the opposite conclusion is apparent or when the findings are found to be unreasonable, arbitrary, or not based on the evidence. *People v. Jones*, 2014 IL App (1st) 120927, ¶ 50. Though we

give substantial deference to factual findings, we remain free to decide the legal effect of the facts and review the trial court's ultimate ruling on the suppression motion *de novo*. *Lindsey*, 2020 IL 124289, ¶ 14.

¶ 60     Defendant challenges the State's use of his statements made on October 9, 2011, before he was given *Miranda* warnings. Our analysis, however, is not confined to that date. We are obligated to consider the totality of the circumstances when determining whether a defendant was in custody for *Miranda* purposes. *People v. Beltran*, 2011 IL App (2d) 090856, ¶ 37 (no single factor in the custody analysis is dispositive, and in each case the court considers all of the circumstances). The facts in this record make clear that what happened on October 9, 2011, cannot be viewed in isolation. Accordingly, we review all the relevant dates and circumstances in this case, including the events that occurred on September 11, 12, and 13, 2011, and on October 9, 2011.

¶ 61     Defendant has failed to challenge the trial court's factual findings made at the suppression hearing. The trial court at that hearing made both general and specific credibility findings. Defendant has not addressed them on appeal.

¶ 62     In ruling on the suppression motion, the trial court recognized that the only inconsistency between the testimony of Detective Haidari and defendant was defendant's statement that he cooperated with police upon threat of arrest for obstruction of justice. The trial court resolved the inconsistency against defendant and found his claim of a threat of arrest was contradicted by his own statements made on videotape on September 12, 2011, and under oath on September 13, 2011, before the grand jury. Defendant told the ASA and the grand jury, repeatedly, that the police had treated him "great" and "perfect," and no one had threatened him or promised him anything. The trial court found the only explanation given by defendant at the suppression hearing as to why his cooperation with police was involuntary, that being the alleged threat of arrest, was not credible. The trial court found Detective Haidari's testimony was credible. Defendant's testimony was found not credible.

¶ 63     The trial court was in the unique position of hearing testimony directly from defendant on the stand and heard the testimony from Detective Haidari in open court. The trial court had the opportunity to observe the witnesses' demeanor, tone, and all the other things attendant to live testimony that we may not glean from a cold record. We defer to the trial court's factual findings, especially in absence of any argument on appeal challenging them. *People v. Bahena*, 2020 IL App (1st) 180197, ¶ 23 (at a hearing on a suppression motion, the trial court acts as the fact finder and, as such, is responsible for determining the credibility of the witnesses, drawing reasonable inferences from the testimony and other evidence, and weighing the evidence presented). We now turn to consider the legal effect of the facts adduced at the suppression hearing.

¶ 64     Defendant claims his pre-*Miranda* statements made to police on October 9, 2011, were obtained in violation of the United States Constitution and were subsequently presented to the jury to secure an unfavorable verdict. We reject defendant's argument. The facts and circumstances of this case demonstrate that defendant continued to cooperate with police on a voluntary basis on several occasions as the investigation developed over the course of more than a month, September into October 2011. The totality of the circumstances surrounding defendant's questioning by police, including his multiple trips to the police station in Maywood, do not support a finding of compulsion, nor do they show coercion on the part of the police. Rather, the relevant factors, taken together with everything contained in this record,

lead to the singular conclusion that defendant was not in custody or otherwise deprived of his freedom of action in any significant way on October 9, 2011, or on any of the other dates. *Miranda* warnings were therefore not necessary until they were given. Defendant confessed to the murders of Maria and John after he was *Mirandized*. Our consideration of the factors, as they apply to a reasonable 17-year-old under the same circumstances, does not change the outcome.

¶ 65 The first encounter with police was on September 11, 2011. Detectives Haidari and Kelly went to defendant's home at 4 p.m. Defendant opened the door and agreed to accompany the detectives to the police station in Maywood to discuss an investigation involving Granat. Defendant went voluntarily. No threats of arrest were made. Defendant was searched before the ride, but as Detective Haidari explained, his car did not have a cage, and the search was conducted for officer safety.

¶ 66 Defendant was not handcuffed, and nothing was taken from him. He was placed in an unlocked room and spoke with police starting at 5 p.m. Defendant was allowed to use the bathroom, sat at a police officer's desk, typed the password to his Facebook page, and proceeded to go through the page with detectives, pointing out his friends and identifying them. At 6:05 p.m., defendant signed two "consent to search" forms, one for his cellphone and one for his Facebook page. He allowed police to download information from his phone, was given his cellphone back, and left the station at 1 p.m. Defendant was asked to come back the next day, and did so, this time with his father, who was a police officer.

¶ 67 The second encounter with police was on September 12, 2011. Defendant's father, who was a police officer, accompanied him with detectives to the police station and sat outside the door as he spoke with the ASA on videotape. Defendant was not handcuffed, the discussion lasted 20 minutes, and Qasem, defendant, and defendant's father made arrangements for defendant to testify before the grand jury the next day. Defendant and his father left the station. The third encounter was on September 13, 2011. Defendant testified before the grand jury, indicating, in pertinent part, that (1) he had not been threatened with arrest, (2) the police treated him perfectly, and (3) he was giving testimony freely and voluntarily without having been promised anything or threatened. When he was done testifying, defendant went home.

¶ 68 The fourth encounter occurred on October 9, 2011, a month later. Detectives Haidari and Kelly went to defendant's house in the morning, at 10:30 a.m., and asked defendant to come to the police station another time. Qasem went with him. They were not handcuffed. Nothing was taken from them. Defendant testified at the suppression hearing that his mother objected to this trip. However, the testimony was inconsistent with that of Detective Haidari, who did not recall the objection, and Qasem, who said it never happened.

¶ 69 Defendant was interviewed at 11 a.m., and again at 12 p.m. Detectives asked defendant in the second interview about his presence in the area of Granat's home between 2 and 3 a.m., because location history obtained by police indicated his cellphone was in the area at that time. The police only had information that defendant's cellphone, not his person, was in the area at the time. During the interview, defendant changed his previous story to account for the presence of his cellphone near Granat's house at the time. He then asked for a piece of paper and drew an accurate picture or diagram of the crime scene. Police left the room, defendant fell asleep, and defendant was read his *Miranda* rights at 2:15 p.m. Defendant continued to talk and confessed.

- 13 -

¶ 70    The facts in this record show a continuum of voluntary cooperation between defendant and the police. The facts further show that defendant's parents were aware of and involved in their son's cooperation with authorities. They accompanied defendant to the Maywood police station, brought him medicine while he was there, and left with defendant from the police station on more than one occasion. Defendant's parents knew about defendant's testimony as a witness before the grand jury. Unlike the average parent, who would be unaware of investigation procedures and the criminal process generally, defendant's father was a police officer. Defendant's father was present at the police station when arrangements were made for defendant to testify. Defendant was never handcuffed, items were not taken from him, he was always in an unlocked room, and he was allowed to leave on three separate occasions. Defendant went back and forth to the police station. The prevailing circumstances in the record, as a whole, would have communicated to a reasonable 17-year-old the status of cooperating witness, not suspect.

¶ 71    Defendant argues on appeal that the location of the alleged interrogation at the Maywood police station "naturally supports the argument that the suspect was subject to a custodial interrogation" (citing *People v. Wheeler*, 281 Ill. App. 3d 447, 456 (1996)). We disagree. Defendant, on October 9, 2011, was no stranger to the interview room of the Maywood Police Department. In fact, he had been there several times. The location was not new, and the circumstances were not unfamiliar. Even if defendant was not fully aware of and well-acquainted with his surroundings, mere location is not dispositive of the question of custody. *Id.* ("merely because a suspect is questioned at a police station does not mean that he is in custody for purposes of *Miranda*").

¶ 72    Defendant further argues that "the fact that the room was unlocked shows that suspects interrogated in these rooms do not feel at liberty to come and go as they please, as locks are unnecessary." This argument is unavailing. The fact that the door to the interview room had a lock was meaningless. The fact that it was unlocked matters. Doors have locks, and in police stations, they serve an obvious and important purpose. We reiterate, defendant was in unlocked rooms at the station several times before. On October 9, 2011, it was defendant's third time there.

¶ 73    Defendant claims he "remained in the interrogation room for nearly four hours before he was *Mirandized*." Defendant then attempts to draw an analogy between his situation and the facts present in the case of *People v. Clayton*, 2014 IL App (1st) 130743. In *Clayton*, we held that the 17-year-old defendant—who was met by four police officers at her home, taken to the police station at 11 p.m., interrogated until 4:15 a.m., and then left in the lobby to find a way home—was in custody for *Miranda* purposes. We reject defendant's analogy. The circumstances present in *Clayton* are demonstrably different from those established here.

¶ 74    We analyzed a single interrogation in *Clayton* that occurred on March 6, 2008. In this case, we are tasked with analyzing several interrelated encounters with police on four occasions. *Clayton* is inapplicable for this reason alone. But there are several additional differences.

¶ 75    The defendant in *Clayton* was met by four police officers at her home at 11 p.m. *Id.* Defendant here, went with detectives to the station several times and, on one occasion, he went with detectives to testify before the grand jury. Defendant's parents were aware of the events and even accompanied him to the station and took him medicine. Detectives arrived at defendant's home during the day, not at night.

- 14 -

¶ 76 Furthermore, the defendant in *Clayton* was in the station through the night and was interrogated twice. One session started at 3:55 a.m., nearly five hours after she was brought into the station. *Id.* ¶ 7. These facts are absent from the record in this case. Detective Haidari testified that on October 9, 2011, defendant was interviewed at 11 a.m. and 12 p.m. During the second interview, he drew the diagram of the murder scene. Detective Haidari testified that he left defendant alone in the room after the picture was drawn and returned at 2:15 p.m. to give him *Miranda* warnings. Defendant testified at the suppression hearing that after the detective left the room, he fell asleep. The record establishes that defendant was left alone in an interview room and fell asleep, not that he was questioned by police for several hours until he finally, drew a picture of the murder scene and implicated himself in the crimes.

¶ 77 Defendant argues that the interview on October 9, 2011, was a custodial interrogation because the detectives sought to "confront" defendant with cellphone location data that called into question his earlier statements made to police at the station on prior occasions. But the type of information conveyed to a person in a police interview does not, in and of itself, give rise to custodial circumstances and automatically warrant a finding of custody. Defendant has failed to demonstrate that the interview was anything more than a follow-up on information subsequently obtained by police. Defendant has further provided no concrete basis for his assertion on appeal that the interview on October 9, 2011, was "confrontational" or coercive in any way.

¶ 78 We point out that defendant had an explanation as to why his cellphone was in the vicinity of Granat's house when the murders occurred and fed that explanation to police. As the trial court found, it was only when he asked for a piece of paper and drew a diagram of the murder scene that detectives first learned he possessed unique information not known to others and became a suspect. The police had questioned defendant at the police station before about his whereabouts on the night of the murders, and defendant voluntarily tendered his cellphone to police, walked them through his Facebook page to support his answers, and filled-out consent to search forms. Defendant has failed to show how the third time he interacted with police at the station, and offered yet even more information in support of his answers as to his whereabouts, was nothing more than another set of unremarkable circumstances that were part and parcel of his established pattern of voluntary cooperation.

¶ 79 Defendant cites to *People v. Harris*, 2012 IL App (1st) 100678, ¶ 52, and argues that "even if [defendant's] mother did not protest when detectives took her son the police station [on October 9, 2011], the fact remains that [defendant's] parents were not present at the station during the questioning and [defendant] was isolated from both friends and family during the interrogation." This contention is meritless.

¶ 80 The paragraph of *Harris* to which defendant cites as support reads as follows:

> "*Miranda* recognized that incommunicado interrogation—after a person is whisked from street to station for questioning, isolated from family and friends, and suddenly loses freedom of the outside world—trades on an individual's weakness and insecurity and presents inherently coercive pressures that may compel a person to speak rather than refrain from asking for the interview to terminate." *Id.*

Defendant in this case was not "whisked from the street to station," he was not "isolated from family and friends," and his fourth encounter with the same detectives at the same police station cannot be reasonably characterized as a "sudden loss of freedom."

¶ 81     Finally, the record shows that defendant was not handcuffed, booked, fingerprinted, or photographed at any point during his encounters with police. No indicia of formal arrest exist in this record. Defense counsel admitted this at the oral argument in this case. Defendant's claim "the manner [in] which he was brought to the police station supports the inference that he was in custody." We disagree. The complained of mode of transport on October 9, 2011, was neither shocking, nor out of the ordinary. Defendant went with detectives to the station in their car on several occasions. On one occasion, defendant's father went with him. He then sat outside an interview while defendant spoke with the ASA on videotape. The trip to the station on October 9, 2011, based on this record, was yet another trip to the police station and not demonstrative of custody.

¶ 82     We are thoroughly unpersuaded by defendant's contention that the fact that "[he] was not allowed to walk from the interrogation room freely, unaccompanied by officers makes it clear that he would not have felt free to leave." Police stations are secure facilities, as Detective Hairdari testified to at the suppression hearing. Defendant claims on appeal that he was a particularly vulnerable juvenile. However, there was scant evidence, at best, of any vulnerability presented at the suppression hearing.

¶ 83     We have given due consideration to the totality of the surrounding circumstances and addressed the relevant factors, recognizing that not a single factor is dispositive. We find that defendant was not in custody for *Miranda* purposes. From the standpoint of a reasonable 17-year-old facing the exact same circumstances, the result remains the same. The circumstances are not demonstrative of compulsion, and the record does not support a finding of police coercion.

¶ 84     Accordingly, *Miranda* warnings were not necessary until defendant was subjected to a custodial interrogation, which was after he drew a picture of the murder scene. The trial court's credibility and other factual findings were not against the manifest weight of the evidence, and the trial court did not err when it denied defendant's motion to quash arrest and suppress the evidence. Our determination forecloses defendant's additional argument on appeal that the police deliberately engaged in the "question first, warn later" tactic condemned in *Missouri v. Seibert*, 542 U.S. 600, 606 (2004). See *People v. Harris*, 389 Ill. App. 3d 107, 121 (2009) ("[b]ecause defendant's custodial interrogation did not begin until *Miranda* warnings were given, a *Seibert* violation could not have occurred").

¶ 85                                    B. Harmless Error

¶ 86     Even if the record in this case demonstrated that an error occurred, it would have been, as the State contends, harmless. *People v. Wilson*, 2020 IL App (1st) 162430, ¶ 57 (the improper admission of a defendant's statements to the police is subject to a harmless-error analysis). Defendant maintains that his confession was the most important piece of evidence presented against him at trial and that the State relied on it during closing argument. On this record, defendant's argument is unavailing. A thorough review of the facts reveals that, absent defendant's confession, the result at trial would have remained unchanged. The other evidence presented against defendant was overwhelming and could have supported a finding of guilt beyond a reasonable doubt by a rational trier of fact. See *People v. Patterson*, 217 Ill. 2d 407, 428 (2005) (explaining that the harmless-constitutional-error test is satisfied when the other evidence in the case overwhelmingly supported the conviction).

¶ 87      Qasem was an eyewitness to and participant in the brutal murders of John and Maria. He entered a plea of guilty to first degree murder and received a 40-year sentence in exchange for his truthful testimony. At trial, Qasem gave an intimate and personal account of what happened to the jury. He explained the critical events in excruciating detail and covered defendant's role in the conspiracy, the execution of the murder offenses, and the elaborate cover up, which included deceiving law enforcement and the grand jury. In Illinois, the positive and credible testimony of an eyewitness is sufficient to convict for the offense of murder. *People v. Swenson*, 2020 IL 124688, ¶ 36; *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009); *People v. Young*, 206 Ill. App. 3d 789, 807 (1990). Based on the specificity with which Qasem recounted the events for the jury, it could have found him to be credible, regardless of the fact of or degree of his participation in the criminal acts and events.

¶ 88      Qasem testified that he was present at defendant's house when the murder weapons were chosen. Defendant looked under the porch, found two baseball bats and a machete, and stated, "I guess we'll use these." While at defendant's house, he, defendant, and Salahat agreed to carry out the murders, and they identified each other's roles. Qasem explained how Granat texted defendant and then defendant texted him, indicating that it was time to get on the Skype call and receive the codeword "concert." The word was a cue to commit the murders. Qasem testified that he purchased gloves at Menards, they switched cars, and he described the mood in the vehicle on the way to Granat's house as "a bunch of idiots ready to go kill two people and think nothing of it."

¶ 89      Qasem told the jury what happened immediately before the murders were committed. He and defendant walked up the stairs to reach John and Maria's bedroom, and their bats clinked together. Qasem freaked out, but defendant slapped him on the back and said, "F*** that. You ready to live like a king?" Qasem then followed through and entered John and Maria's bedroom. He raised his bat above his head, and he and defendant both beat John and Maria to death. Qasem told Granat his mother was still alive. Granat told him to make sure she was dead and handed him a knife. Qasem stabbed Maria several times in the stomach. After the murders, defendant found some coins and jewelry, and Qasem looked for a safe in the attic, but found nothing. Qasem and defendant were paid for committing the murder, $4000 to Qasem and $8000 to defendant. Everyone, including defendant, agreed upon the story they would tell the police. Qasem and defendant went back and forth to the police station and testified before the grand jury after the murders. They stuck to the story.

¶ 90      Qasem recounted the critical events as an eyewitness, from beginning to end, and in excruciating detail. His eyewitness testimony provided overwhelming evidence of defendant's guilt such that, even without defendant's confession, a rational trier of fact would have been justified in finding defendant guilty of the crimes beyond a reasonable doubt. See *Swenson*, 2020 IL 124688, ¶ 36; *Patterson*, 217 Ill. 2d at 427-28.

¶ 91      But Qasem's testimony was not the only evidence presented against defendant at trial. Wydra, defendant's girlfriend, told the jury that she found $15,000 in a guitar bag in defendant's bedroom, that defendant gave her a shirt with blood on it (the blood was later identified as belonging to John), and that defendant told her he could not get their screams out of his head. The testimony of Qasem and Wydra, taken together, provided more than enough evidence to support a finding of guilt beyond a reasonable doubt. *Patterson*, 217 Ill. 2d at 427-28. Accordingly, even if there was an error in this case, and there was not, the State would

have met its burden of proof and demonstrated harmless error.

¶ 92        C. Whether the Sentencing Determination Was an Abuse of Discretion

¶ 93    The Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11; *People v. Patterson*, 2018 IL App (1st) 101573-C, ¶ 24. This constitutional mandate calls for the balancing of the retributive and rehabilitative purposes of punishment. *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). This balancing process requires careful consideration of all factors in aggravation and mitigation, including, "the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well as the nature and circumstances of the crime and of defendant's conduct in the commission of it." *Id.* The most important sentencing factor is the seriousness of the crime. *People v. Williams*, 2017 IL App (1st) 150795, ¶ 44.

¶ 94    The trial court has broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). Deference is given to the trial court's sentencing determination because the trial judge, having observed the defendant and the proceedings, has a far better opportunity to consider these factors than the reviewing court, which must rely on the cold record. *People v. Fern*, 189 Ill. 2d 48, 53 (1999). In considering the propriety of a sentence, the reviewing court must proceed with great caution and cannot substitute its judgment for that of the trial court merely because it would have weighed the applicable factors differently. *Id.* A sentence within statutory limits will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. *Id.* at 54.

¶ 95    Discretionary life sentences imposed upon juvenile defendants, such as the one imposed here, violate the eighth amendment unless the trial court (1) considers the defendant's youth and its attendant circumstances and (2) finds that "the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *People v. Holman*, 2017 IL 120655, ¶¶ 40, 46. In Illinois, a trial court must also consider the following factors when it undertakes to the difficult task of sentencing a juvenile defendant to a term of imprisonment:

"(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;

(2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

(3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." 730 ILCS 5/5-4.5-105 (West 2016).

¶ 96    Defendant takes issue with the trial court's sentencing determination in this case. But, to be clear, he does not claim that the trial court failed to weigh the evidence and sentencing factors that applied to him. Rather, defendant challenges the way in which the trial court weighed the evidence and applicable factors. Accordingly, we review the trial court's sentencing question for an abuse of discretion. *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 15 ("Illinois courts have long recognized that the imposition of a sentence is left to the sound discretion of the trial court and will not be altered upon review absent an abuse of that discretion."). The critical question is whether no reasonable person would have sentenced defendant in the way the trial court did here.

¶ 97    The trial court in this case engaged in an exhaustive review and consideration of defendant's youth and its attendant circumstances, the statutory factors applicable to juveniles, and the voluminous information and evidence presented by defense counsel in mitigation at the sentencing hearing. Defense counsel was afforded the opportunity to present evidence demonstrating that defendant was not irreparably corrupt or irredeemable and that his conduct stemmed from youth, impulsivity, or some other characteristic of his childhood circumstances. *People v. Croft*, 2018 IL App (1st) 150043, ¶ 23 (pointing out that a key feature of the juvenile's sentencing hearing is that the defendant had the opportunity to present evidence to show that his or her criminal conduct was the product of immaturity and not incorrigibility). The trial court weighed the evidence and applicable factors and found that defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation. See *Holman*, 2017 IL 120655, ¶ 46.

¶ 98    Defendant asks this court to reweigh the evidence and factors, and to arrive at a different sentencing determination. That is not our function. *Croft*, 2018 IL App (1st) 150043, ¶ 33 ("nothing in *Miller* or *Holman* suggests that we are free to substitute our judgment for that of the sentencing court"). We hold, based on this record, that the trial court did not abuse its discretion when it sentenced defendant to two natural life terms of imprisonment.

¶ 99    At the oral argument in this case, defense counsel claimed that the seriousness of the criminal offense had taken a back seat to rehabilitative potential for the purposes of juvenile sentencing. This contention is rejected because defendant has turned our attention to no authority supporting the position. The seriousness of the offense has not been displaced by rehabilitative potential for sentencing purposes; it remains the most important factor when a trial court undertakes to balance the retributive and rehabilitative purposes of punishment as required by the Illinois Constitution. Ill. Const. 1970, art. I, § 11; *Quintana*, 332 Ill. App. 3d at 109.

¶ 100   The cruelty of the offense in this case is unfathomable. The intimacy with which the murders were carried out is demonstrative of a callousness seldom seen. Defendant stood in close proximity to John and Maria as they lay asleep, lifted a baseball bat above his head, and beat John repeatedly until he died. Defendant aimed for John's face. The murder offense was horrific and unforgettable. But, as the trial court expressed at the sentencing hearing, defendant's commission of the murder offense cannot be viewed in isolation. Rather, for

sentencing purposes, the series of interrelated criminal acts undertaken by defendant before, during, and after the murders must be viewed together, as parts of a whole.

¶ 101    This was, as the trial court stated, "a criminal conspiracy" from "beginning to end." Defendant agreed to the murder-for-hire scheme, chose the murder weapons, received the Skype call with the code word, served as the point person, urged Qasem to commit the murders when he had second thoughts, personally carried out the beatings, stole John and Maria's coins and jewelry after the fact, accepted the remuneration from Granat, burned the evidence in his backyard, had Salahat ditch the bats in the forest preserve, gave his bloody t-shirt to his girlfriend to hide, lied to police in person and on tape on several occasions, and even lied to the grand jury under oath. These facts demonstrated sophistication, premeditation, and deliberation. The trial court was correct to consider the totality of defendant's conduct, as opposed to just the murders alone, when it sentenced him.

¶ 102    Contrary to defendant's contentions, the record reflects that the trial court went through the applicable mitigation factors (see 730 ILCS 5/5-4.5-105 (West 2016)), carefully considering them one-by-one. The trial court determined that defendant's conduct showed he was beyond rehabilitation. With respect to the first factor, "the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any," the trial court noted that defendant was 17 years and five months old at the time of the murders. The evidence adduced at the sentencing hearing demonstrated that defendant was mature, he stood up to his father during altercations, and "in fact, looked out for everyone in the house including his mother."

¶ 103    As for the ability to consider risks and the consequences of his behavior, the trial court stated that it was

> "certainly clear from the planning throughout as to what they were going to do, and the preparation of the alibis, the practicing of alibis *** the lying to police, the State's Attorneys, and to the Cook County Grand Jury *** indicate that the defendant certainly could understand and consider the risks and consequences of his behavior and how to cover it up."

The trial court made clear that there was "no evidence whatsoever" that defendant suffered from a mental disorder and "no testimony, nor *** even a mention of any psychiatric or counseling." Defendant was not operating under a disability.

¶ 104    With respect to the second factor—"whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences"—the trial court found that defendant "gladly went along" with Granat's plan for his parents. The trial court noted that defendant exerted pressure upon Qasem when he slapped him on the back on the stairs leading up to John and Maria's bedroom, and asked him if he wanted to "live like a king." Defendant convinced him to go through with the murders. The enticement was money, defendant applied the pressure, and the motivation was "greed."

¶ 105    Defendant contends that the trial court failed to adequately consider his susceptibility to peer pressure from Granat. This argument is unavailing. The trial court thoroughly considered the peer pressure applied to defendant by Granat and examined their financial relationship. The trial court concluded that defendant had the capacity to make his own decisions and did so when he participated in the murders of John and Maria. Defendant disapproves of the way in

which this factor was weighed. Such disapproval is not a basis for finding an abuse of discretion.

¶ 106     Regarding the third factor—"the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma"—the trial court explained that it considered the presentence investigation and the mitigation report, which included an article on childhood development and the potential effects of prolonged marijuana use and excessive video game playing. Defendant takes issue with the statement made by the trial court that it would take this article "for what it's worth." We fail to see how this would amount to an abuse of discretion. The trial court duly considered the article, compared it with the evidence presented at the sentencing hearing, and made the determination that inconsistencies between defendant's statements of marijuana use and the testimony of his family members warranted giving the factor little to no weight. The trial court evaluated and addressed, but did not find, that defendant's video game playing was of significance when viewed in relation to the evidence.

¶ 107     With respect to defendant's "home environment," the trial court recognized that there was a "considerable amount of dysfunction in the Wyma household." It also noted that defendant alleged physical abuse at the hands of his father in the presentence investigation report. Defendant further stated that his father was an alcoholic. But regarding defendant's allegations of physical abuse until he was eight or nine years old, the trial court found there was "no testimony" and "nothing in the record to indicate that this defendant suffered any bruises," and defendant's sister Cat "sat here and told me that it didn't happen."

¶ 108     Concerning the fourth factor—"the person's potential for rehabilitation or evidence of rehabilitation"—the trial court found that the evidence before it, as a whole, showed a lack of rehabilitative potential on the part of defendant. Regarding the fifth factor—"the circumstances of the offense"—the trial court made the following statement: "This was a horrific, horrific crime carried out in the most cold and calculated fashion, could not have been any more brutal or heinous, which I have described what those two—the horrific death those two people suffered."

¶ 109     Discussing the fifth factor—"the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense"—the trial court noted that defendant and Granat were "intertwined," but made its findings clear that defendant readily agreed to go through with the murder, participated extensively in the planning, and did so for one sole purpose: "greed."

¶ 110     The trial court found that defendant had been "able to meaningfully participate in his or her defense," which was the sixth factor, and the trial court duly considered the seventh factor, "the person's prior juvenile or criminal history." It recognized that defendant had no recorded juvenile or criminal history and behaved in pretrial custody and explained that defendant had studied to receive his general education degree. As for the eighth and final factor—"any other information the court finds relevant and reliable, including an expression of remorse, if appropriate"—the trial court stated that defendant had made a statement in allocution and apologized to the families of John and Maria.

¶ 111     The trial court then turned to facts in aggravation and, again, discussed the evidence and took care to set out the facts and circumstances surrounding the crime. The trial court found that defendant's conduct demonstrated "irredeemable and irreparable corruption." It stated, "I have looked throughout this record of extensive mitigation for any rehabilitation, rehabilitative

- 21 -

potential that this defendant may have, I didn't see it." Before it sentenced defendant, the trial court brought up defendant's statement to Granat after John and Maria had been killed: "F*** them, they deserved it."

¶ 112    Defendant has failed to persuade this court that no reasonable person would have sentenced defendant to serve two consecutive life sentences in prison. Defense counsel was afforded the ability to present—and did present—extensive evidence in mitigation to persuade the trial court that defendant's youth, his upbringing, and his experiences as a juvenile had in some way mitigated in his favor for the purposes of sentencing. The evidence was considered at length and in detail. So were all the other factors a trial court must consider when sentencing an individual to a term of imprisonment. Defendant's arguments here amount to no more than a disagreement with how the trial court decided to weigh the factors.

¶ 113    The record shows that the trial court's consideration of the applicable sentencing factors, and defendant's youth and its attendant circumstances, was not, as defendant contends, inadequate. The trial court did not abuse its discretion and neither a reduction in sentence, nor a new hearing is warranted.

¶ 114                                   III. CONCLUSION
¶ 115    Accordingly, the judgment of the Circuit Court of Cook County is affirmed.

¶ 116    Affirmed.

¶ 117    JUSTICE WALKER, specially concurring:

¶ 118    I agree with my colleagues' conclusion that the trial court did not err by admitting Wyma's confession into evidence and that the evidence, including the confession, overwhelmingly supports the conviction. I also agree that the trial court did not abuse its discretion by imposing two consecutive sentences of natural life in prison. I write separately because I disagree with my colleagues' discussion of harmless error and I advocate for two changes to the applicable law.

¶ 119                                   A. Harmless Error
¶ 120    After holding that the trial court committed no error by admitting the confession into evidence, the majority finds that if the court erred, the error caused no harm. I disagree. Our supreme court stated, "Confessions carry extreme probative weight, and therefore the admission of an unlawfully obtained confession rarely is harmless error." (Internal quotation marks omitted.) *People v. St. Pierre*, 122 Ill. 2d 95, 114 (1988). Although the State presented strong evidence against Wyma apart from the confession, this is not the rare case in which we can find that the admission of the confession into evidence made no difference.

¶ 121    As to the harmless error analysis, the majority applied the wrong standards. To find the alleged error harmless, this court must find beyond a reasonable doubt that the jury would have believed Qasem's testimony and convicted Wyma if it did not hear Wyma's confession. See *Chapman v. California*, 386 U.S. 18 (1967). A jury might have doubted Qasem because of the tremendous benefit Qasem gained from testifying against Wyma. The testimony of an accomplice "must be cautiously scrutinized" (*People v. Ash*, 102 Ill. 2d 485, 493 (1984)), and the trier of fact should not accept it without an "absolute conviction of its truth" (*People v.*

- 22 -

*Williams*, 65 Ill. 2d 258, 267 (1976)). From our vantage point, relying on a cold record, we cannot say beyond a reasonable doubt that the jury would have believed Qasem if it had not also heard Wyma's confession.

¶ 122     Wydra's testimony helped the prosecution's case considerably, but a jury could also doubt her because Wydra was Wyma's ex-girlfriend. See *People v. Hiller*, 92 Ill. App. 3d 322, 327 (1980). The majority needlessly addresses the issue of harmless error after finding that the trial court did not err, and then the majority reaches the wrong conclusion about the effect of the alleged error. This is not the rare case in which we can find beyond a reasonable doubt that the admission into evidence of the defendant's confession made no difference to the result.

¶ 123                                      B. Interrogation of a Juvenile

¶ 124     Although the majority correctly applies binding precedent concerning the sentence and the admissibility of the confession, I write separately to advocate for changing the law as to both issues. The prosecution persuaded the trial court that police arrested Wyma around noon on October 9, 2011, when Wyma drew a diagram of the murder scene. Police then started questioning Wyma, not as a witness for the prosecution, but instead as a murder suspect. Police admitted that they made no effort to contact Wyma's parents when they arrested him and changed the direction of their questioning.

¶ 125     The Juvenile Court Act provided: "A law enforcement officer who arrests a minor without a warrant under Section 5-401 shall *** immediately make a reasonable attempt to notify the parent *** that the minor has been arrested and where the minor is being held." 705 ILCS 405/5-405(2) (West 2000). The apparent violation of section 5-405 makes no difference here because the confession appears voluntary, under the totality of the circumstances, despite the lack of parental notice. See *People v. Patterson*, 2014 IL 115102, ¶ 58.

¶ 126     A note written in the Vanderbilt Law Review has challenged the use of the totality of the circumstances test for the admissibility of juvenile confessions. The author argues that when the totality of the circumstance analysis is applied, juvenile offenders, and of course young adult offenders, will generally not succeed in a motion to suppress a confession based on having no parent or guardian present during questioning. Juveniles and young adults are often interrogated with no parent present, and there are times when extremely young juvenile offenders are found to have "voluntarily" waived their rights under the constitution.

¶ 127     A juvenile or young adult may claim to understand warnings to please the police. A juvenile or young adult should have more than warnings to appreciate the rights that are waived. There should be a parent or guardian present to assure their understanding.

>        "Requiring the presence of a parent, guardian or legal counsel during a juvenile custodial interrogation is an approach that could solve [several] *** problems ***. It could remedy the problems encountered by states and allow police officers and courts to tailor their behavior to the Constitution. It would both adequately protect juvenile's constitutional rights but still allow police to utilize current interrogation procedures to investigate crime and apprehend the criminal.
>
>        The procedure would work as follows. Once a juvenile [or young adult] is in police custody on suspicion of a felony, he should be read his *Miranda* warnings as required by *Gault* [(*In re Gault*, 387 U.S. 1 (1967))] and *Miranda* [(*Miranda v. Arizona*, 384 U.S. 436 (1966))]. Then the police should inform the child that he has the right to have

a parent or guardian with him during questioning. Police would then ask the juvenile [or young adult] the names and phone numbers of his parents or guardian and ascertain how the parent or guardian of the child could be reached. The police officer would then have to take reasonable steps to contact the *** parents ***.

* * *

Once contact with the *** parent or guardian is established and the basic information imparted, the police officer would then request that the parent or guardian come to the police station to be present with the juvenile [or young adult] during interrogation.

Until the parent or guardian arrives, the police would be forbidden to ask the juvenile [or young adult] any questions regarding the alleged crime. It would be a situation constitutionally similar to that of an adult defendant who has asserted [a] right to counsel under the Fifth Amendment—all police interrogation would cease. Any information elicited from the juvenile [or young adult] by the police before a parent or guardian was present would be inadmissible at trial as violative of the Fifth Amendment.

Upon the arrival of the parent or guardian, the police would verify that both the child and parent understood the *Miranda* rights as had been read to them." Robert E. Mcguire, *A Proposal to Strengthen Juvenile Miranda Rights: Requiring Parental Presence in Custodial Interrogations*, 53 Vand. L. Rev. 1355, 1383-84 (2000).

¶ 128    Courts should better protect the rights of juveniles and young adults and better define the duties of police officers confronting juveniles and young adults by adopting a bright-line test and excluding from evidence all statements obtained from juveniles and young adults when police question them as suspects without contacting parents or guardians.

¶ 129    C. Sentencing

¶ 130    The trial court exercised its discretion to sentence Wyma to life in prison without the possibility of parole. While we have no grounds for finding that the trial court abused its discretion, this case appears to fit the United States Supreme Court's admonition that an "unacceptable likelihood exists that the brutality or cold-blooded nature of any particular crime would overpower mitigating arguments based on youth as a matter of course, [despite] the juvenile offender's objective immaturity, vulnerability, and lack of true depravity." *Roper v. Simmons*, 543 U.S. 551, 573 (2005). I agree with scholars who call for an end to the imposition on juvenile offenders of sentences of life in prison without the possibility of parole.

¶ 131    Even with the horrific facts of this case, I would find that "[a] life without parole sentence improperly denies the juvenile offender a chance to demonstrate growth and maturity." *Graham v. Florida*, 560 U.S. 48, 73 (2010). Because of binding precedent, I concur in the judgment of the majority's decision. I ask the courts and the legislature to consider possible changes to the law applicable to juvenile offenders.